ALFONSO SUAREZ *v.* DICKMONT PLASTICS CORPORATION
(SC 15452)

Berdon, Norcott, Katz, Palmer and Peters, Js.

Argued February 18—officially released August 5, 1997

*Christopher Rooney*, with whom was *Kevin C. Doyle*, for the appellant (defendant).

*Scott S. Centrella*, with whom, on the brief, was *Jonathan P. Whitcomb*, for the appellee (plaintiff).

*Opinion*

KATZ, J. This appeal arises from a judgment rendered for the plaintiff, Alfonso Suarez, following a jury verdict against the defendant, Dickmont Plastics Corporation, after remand from this court in *Suarez* v. *Dickmont Plastics Corp.*, 229 Conn. 99, 639 A.2d 507 (1994), in which we reversed the summary judgment originally rendered for the defendant. In *Suarez*, this court concluded that a plaintiff employee could establish an intentional tort claim and overcome the exclusivity bar of the Workers' Compensation Act (act); General Statutes § 31-275 et seq.;[1] by proving either that the employer actually intended to injure the plaintiff (actual

---

[1] General Statutes (Rev. to 1995) § 31-284 provides in pertinent part: "(a) An employer shall not be liable to any action for damages on account of personal injury sustained by an employee arising out of and in the course of his employment or on account of death resulting from personal injury so sustained, but an employer shall secure compensation for his employees as provided under this chapter, except that compensation shall not be paid when the personal injury has been caused by the wilful and serious misconduct of the injured employee or by his intoxication. All rights and claims between employer and employees, or any representatives or dependents of such employees, arising out of personal injury or death sustained in the course of employment are abolished other than rights and claims given by this chapter, provided nothing in this section shall prohibit any employee from securing, by agreement with his employer, additional compensation from his employer for the injury or from enforcing any agreement for additional compensation. . . ."

intent standard) or that the employer intentionally created a dangerous condition that made the plaintiff's injuries substantially certain to occur (substantial certainty standard). We reasoned: "The substantial certainty test differs from the true intentional tort test but still preserves the statutory scheme and the overall purposes of the act. The problem with the intentional tort test, i.e., whether the employer intended the specific injury, appears to be that it allows employers to injure and even kill employees and suffer only workers' compensation damages so long as the employer did not specifically intend to hurt the worker. . . . Prohibiting a civil action in such a case would allow a corporation to 'cost-out' an investment decision to kill workers. . . . The substantial certainty test provides for the intent to injure exception to be strictly construed and still allows for a plaintiff to maintain a cause of action against an employer where the evidence is sufficient to support an inference that the employer deliberately instructed an employee to injure himself." (Citations omitted; internal quotation marks omitted.) Id., 109–10.

After a trial on the merits following our remand, the jury rendered a verdict in favor of the plaintiff. By its answers to special interrogatories, the jury indicated that the plaintiff had proven that the defendant was liable for the plaintiff's injury, and that the plaintiff was not responsible for his own injury. The trial court refused to set aside the verdict or to render a judgment notwithstanding the verdict. The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

On appeal, the defendant argues that: (1) because the jury found that the plaintiff had failed to prove the defendant liable under the substantial certainty standard, judgment must be rendered for the defendant

because the actual intent standard was not before the jury; (2) even if the actual intent standard had been before the jury, the trial court improperly instructed the jury that the actions of a foreman employed by the defendant may be attributed to the defendant under the theory of either apparent authority or alter ego to establish the defendant's underlying intentional conduct; (3) there was insufficient evidence to support the jury's conclusion that the defendant was liable for the actions of the foreman based on the theory that the foreman was the alter ego of the defendant; and (4) there was insufficient evidence to support the jury's conclusion that the defendant actually intended to injure the plaintiff. We reverse the judgment of the trial court and remand the case to that court with direction to render judgment for the defendant.

The jury reasonably could have found the following facts. In 1973, the plaintiff, a Guatemalan native with a sixth grade education, began working for the defendant and continued his employment, with the exception of a few brief periods, for approximately thirteen years prior to his injury. The defendant is a family owned and operated corporation that manufactures plastic parts using horizontal injection molding machines. As a "floorman," the plaintiff was responsible for, among other duties, removing hot plastic material from the machines at the end of his shift, which ran from 4 p.m. to midnight, so that the material could be stored in an oven until the next working day.

Because of the significant number of employees who spoke only Spanish, including the plaintiff, the defendant employed bilingual foremen to manage the employees on each shift. From approximately 1973 to 1976, the defendant employed a foreman, Santiago Santiago, who was the management person in charge of operations during the plaintiff's night shift, and reported directly to the defendant's owners. During the time

period from 1973 to 1976, Santiago instructed the plaintiff that he was required to remove the material from a hopper using a scoop and to also remove the material from the feed shoot and feed chamber with his bare hands while the machine was still producing plastic parts. On one occasion, the plaintiff attempted to stop the production cycle before the end of his work shift in order to clean out the material and Santiago became angry, yelling "very bad words" at him. Santiago insulted the plaintiff and told him that if the owners were to find out that the plaintiff had stopped production early, they would fire him. During the remainder of his employment with the defendant, out of fear of losing his job, the plaintiff never again attempted to stop production to clean out the material.

On another occasion, the plaintiff attempted to use an industrial vacuum cleaner as a safer method to remove the hot material from the machine while it was still operating. Santiago again became angry, striking a table with a pipe and threatening to fire the plaintiff if he used the vacuum cleaner again, because it wasted the hot material. Because of Santiago's threats, no other floormen cleaned the hot material out of the machines in a manner other than by handling a scoop with bare hands while the machine was operating.

During the years after Santiago had left the defendant's employ, the plaintiff worked under the direction of four other foremen. None of these foremen ever instructed the plaintiff that he was cleaning the hot material out of the machines in an improper manner. The policy remained that the floormen were not authorized to stop the machines to clean out the hot material prior to the end of the work shift. In June, 1986, two fingers on the plaintiff's right hand were partially amputated while he was removing the hot material from one of the machines.

At the close of evidence, the trial court instructed the jury on both the actual intent and substantial certainty standards for proving an intentional injury. Additionally, the trial court submitted four special interrogatories to the jury—three that addressed the defendant's liability and one that addressed the plaintiff's own culpability. In reaching its verdict, the jury answered in the affirmative interrogatory number two, which addressed the actual intent standard, and answered the substantial certainty interrogatories in the negative.[2] The jury also answered interrogatory number four in the negative, finding that the plaintiff was not culpable for his injury.

Accordingly, the jury returned a verdict for the plaintiff in the amount of $150,000. The defendant subsequently filed motions to set aside the verdict and for judgment notwithstanding the verdict, both of which the trial court denied. Specifically, the trial court stated that "viewing the evidence in the light most favorable to the prevailing party, the jury could reasonably have reached the verdict it did. The court finds the jury could

---

[2] Specifically, the jury answered the special interrogatories as follows:

"1. Has the plaintiff established by a preponderance of the evidence that the defendant believed that the plaintiff's injuries are substantially certain to follow from its conduct and policies in place at the time of plaintiff's accident?

Yes ____ No _X_

"2. Has the plaintiff established by a preponderance of the evidence that the defendant deliberately instructed the plaintiff to injure himself based on its policies regarding the cleaning of the plastic injection molding machine?

Yes _X_ No ____

"3. Has the plaintiff established by a preponderance of the evidence that the defendant believed that the plaintiff's injuries were practically, nearly or essentially and sure and inevitable to follow from the defendant's actions?

Yes ____ No _X_

"If you have answered 'yes' to any of the above questions, please proceed to Interrogatory Number 4 and answer that interrogatory.

"4. Has the defendant established by a preponderance of the evidence that the plaintiff committed wilful and intentional misconduct which was a substantial factor in bringing about his injuries?

Yes ____ No _X_ "

reasonably have reached this verdict . . . ." Additional facts will be provided as warranted.

I

The defendant first argues that, because the jury found for the defendant on interrogatories numbers one and three relating to the substantial certainty standard, the jury could not have rendered a verdict for the plaintiff because the actual intent standard had not been presented to the jury. We disagree.

We begin with the defendant's claim that the case was pleaded and tried solely upon the substantial certainty standard and, therefore, that the jury's negative answers to interrogatories numbers one and three contradict the general verdict in favor of the plaintiff.[3] In response, the plaintiff asserts that both the actual intent and substantial certainty standards were before the jury, and that the jury's affirmative answer to interrogatory number two warrants the general verdict. We agree with the plaintiff.

The plaintiff's third amended complaint alleged, in addition to allegations implicating the substantial certainty standard, that his injuries were caused by the "wilful, serious and intentional misconduct" of the defendant.[4] Although these allegations were denied, the

[3] Because the plaintiff had never challenged the Appellate Court's conclusion in *Suarez* v. *Dickmont Plastics Corp.*, 30 Conn. App. 630, 635, 621 A.2d 1356 (1993), that the plaintiff's factual allegations could not support a determination that the defendant had intended to harm him, the defendant also asserts that the present action was tried exclusively on the basis of the substantial certainty standard, in accordance with this court's remand in *Suarez* v. *Dickmont Plastics Corp.*, supra, 229 Conn. 99. Even if we assume, without deciding, that the defendant is correct, we nevertheless conclude that, in light of the defendant's own request to charge on the actual intent standard, as well as its failure to take exception to the trial court's instruction on the actual intent standard, this claim is deemed waived.

[4] The plaintiff's third amended complaint provides in relevant part:

"5. [The plaintiff's] severe and disabling injuries were caused by the wilful, serious and intentional misconduct of [the defendant] in one or more of the following respects:

defendant acknowledged in its memorandum submitted to the trial court that, with respect to these allegations, "[t]he plaintiff must prove that the defendant intended to injure him *or* committed serious and wilful misconduct such that the defendant believed that the plaintiff's injury was substantially certain to follow from the defendant's conduct." (Emphasis added.)

Both parties submitted proposed jury instructions and special interrogatories to the trial court. With respect to the special interrogatories, the trial court adopted nearly verbatim the defendant's proposed draft special interrogatories,[5] with the exception of the defen-

"a. In that the defendant required [the plaintiff] and other employees to always clean the plastic injection molding machine while it was running, which the defendant knew or should have known was substantially certain to cause injury to the plaintiff or other employees;

"b. In that the defendant never warned [the plaintiff] of the dangers then and there existing or of the risk of serious harm to which he was subjected by cleaning the machine while it was running, though the defendant knew or should have known that injury to the plaintiff and/or other employees was substantially certain to occur;

"c. In that the defendant refused to allow [the plaintiff] or other employees to use other, safer methods of cleaning the machine, such as turning the machine off before cleaning or using a vacuum to clean out the plastic, although the defendant knew or should have known that injury to the plaintiff and/or other employees was substantially certain to occur;

"d. In that the defendant did not instruct [the plaintiff] as to how to clean the machine in a safe manner, although the defendant knew or should have known that injury to the plaintiff and/or other employees was substantially certain to occur;

"e. In that the defendant would not provide a protective cover over the feed chute or other protective device on the machine to prevent injuries to persons operating or cleaning it, although the defendant knew or should have known that injury to the plaintiff and/or other employees was substantially certain to occur;

"6. As a direct and proximate result of the defendant's wilful, serious and intentional misconduct, [the plaintiff] suffered severe, permanent and disabling injuries . . . ."

[5] The defendant's proposed draft special interrogatories provided:

"1. Has the plaintiff proven by a preponderance of the evidence that the defendant desired to cause the plaintiff's injuries?

"2. Has the plaintiff established by a preponderance of the evidence that the defendant believed that the plaintiff's injuries are substantially certain

dant's proposed draft special interrogatory number one, which also addressed the actual intent standard.[6] Although the parties had agreed to delete that proposed interrogatory, the trial court, adopting nearly verbatim the defendant's proposed jury instructions, instructed on both the actual intent and substantial certainty standards.[7]

to follow from its conduct and policies in place at the time of plaintiff's accident?

"3. Has the plaintiff established by a preponderance of the evidence that the defendant deliberately instructed the plaintiff to injure himself based on its policies regarding the cleaning of the plastic injection molding machine?

"4. Has the plaintiff established by a preponderance of the evidence that the defendant believed that the plaintiff's injuries were practically, nearly or essentially and sure and inevitable to follow from the defendant's workplace policies in place at the time of the plaintiff's accident?"

[6] With respect to the defendant's proposed draft special interrogatory number one, the following colloquy took place before the trial court:

"[Defendant's Counsel]: Judge, one thing on the special interrogatories?

"The Court: Yes.

"[Defendant's Counsel]: Looking at question number one, based on the evidence, I don't think that question now should even be submitted because I think there was testimony from the plaintiff that he did not feel that the defendant desired to cause him—and it might clarify—

"The Court: I don't have a problem with that. I was going by, I was choosing from column A and column B and I felt that you felt that the question was important. Mr. Centrella [plaintiff's counsel], do you think it's an important question?

"[Plaintiff's Counsel]: They put that question directly to [the plaintiff] pretty much in those words and he said, 'No,' so there's no real evidence of that.

"The Court: All right. Okay.

"[Defendant's Counsel]: So we'll take that out, cause, that may clarify in terms of what's going on."

[7] Specifically, the trial court's instructions provided in relevant part:

"Intent generally: Intentional conduct is purposeful conduct rather than conduct that is accidental or inadvertent. Now intent is a mental process. A court—excuse me, a person may take the stand and testify as to what his or her intention was and you may believe the testimony or not according to whether or not you find that it warrants belief. But intention often can only be proven by the actions and statements of the person whose act is being examined.

"No one can be expected to come into court and testify that he looked into another person's mind and saw there a certain intention. It is often impossible and never necessary to prove intent by direct evidence. Intent

Not only did the trial court instruct on both standards in accordance with the defendant's own request to charge submitted to the trial court, but the defendant

may be proven by circumstantial evidence, as I have explained that term to you.

"Therefore, one way in which the injury—excuse me, therefore, one way in which the jury can determine what a person's intention was at any given time, aside from that person's own testimony, is first by determining what that person's conduct was, including any statement he made and what the surrounding—excuse me, what the circumstances were surrounding that conduct, and then from that conduct and those circumstances, inferring what his intention was.

"In other words, a person's intention may be inferred from his conduct. You may infer from the fact that the person engaged in conduct that he intended to engage in that conduct. This inference is not a necessary one. That is, you are not required to infer intent from the person's conduct, but it is an inference that you may draw if you find it reasonable and a logical inference. I remind you that the burden of proving intent by a preponderance of evidence is on the plaintiff.

"As I shall explain momentarily, intentional conduct is different from merely negligent conduct where someone simply fails or neglects to do some act which the law requires them to do. If you conclude that all the employer has neglected—excuse me, if you conclude that all, that the employer has neglected to implement those procedures that a prudent and cautious person who owns and operates such machines would implement, this would be only negligence and not an intentional act and you would be required to enter a verdict for [the defendant].

"Even if the defendant's conduct demonstrated a reckless indifference to the consequences of its actions, this is not intentional conduct. In order for you to find for the plaintiff you must be convinced, based upon the evidence, that the conduct which the corporation is alleged to have engaged in was caused intentionally by the company.

"To prevail the plaintiff must prove two separate types of intent. One, that the act by the defendant was intentionally undertaken, and two, that the resulting injury was intended. The plaintiff may meet the second requirement of proving an intent on the part of [the defendant] to injure him by showing either: one, that the company desired to cause the injury to result; or two, that [the defendant] believed that the consequences of its acts were substantially certain to follow from the acts.

"Under the first part of this test the plaintiff must show by a preponderance of the evidence that [the defendant] engaged in certain acts that amount to wilful and serious misconduct. These acts are alleged to be certain practices which amounted to a directive to the employees that they clean the machines with their hands and not with a vacuum cleaner, and that they clean the machines while certain parts were moving, which could injure the material handler.

failed to take an exception to the jury instruction on the actual intent standard as an alternative ground for finding liability. The defendant cannot now complain

"You must first determine if the plaintiff has established by a preponderance of the evidence that officials of [the defendant] intentionally created such a directive. In order to find for the plaintiff you must be persuaded that he has shown by a preponderance of the evidence that officials sufficiently high up in the company intended to implement such a policy.

"Secondly, the plaintiff must show that the policy which led to the injury was created knowingly and intentionally by the management and did not develop on its own due to negligence on the part of management in correcting the practice. If you conclude that the plaintiff's injuries were directly caused by the policies which were intentionally adopted by officials sufficiently high in the company management, then the plaintiff has met the first test.

"Intent to cause injury: If the plaintiff proves he was injured due to the policies intentionally adopted by [the defendant], then you may conclude that the conduct was intentional. Then you must go to the second part of the test which requires that the plaintiff prove by a preponderance of the evidence not only that the conduct was intentional, but that [the defendant] intended to injure the plaintiff.

"You should examine whether the evidence in this case established that [the defendant] actually and in fact intended to injure the plaintiff. When determining the intent of the defendant you should focus on the consequences of the defendant's actions and determine whether it desired to cause the plaintiff's injury.

"One way in which the plaintiff may establish an intent to injure is by showing that [the defendant] directed certain procedures with a desire to cause injury to the plaintiff. If you decide that [the defendant's] policies regarding cleaning of the machine were implemented with a desire to cause injury to the plaintiff, you must conclude that [the defendant] has committed an intentional tort.

"Substantial certainty test: The second way in which the plaintiff may show an intent to injure is if he proves that the defendant's conduct meets the so-called 'substantial certainty' test. Substantial certainty in quotes. If the plaintiff proves by a preponderance of the evidence that the defendant acted with knowledge or believed that the plaintiff's injury was to result from its actions.

"Definition of substantially: the word substantially means that the injury practically, nearly, almost or essentially was certain to occur.

"Definition of certain: the word certain as used in the test of 'substantial certainty' means sure or inevitable to follow. Therefore, [the plaintiff] must establish that the defendant knew that his injuries would result from the cleaning of the machine according to their policies to such a degree that they were practically, nearly or essentially certain to follow, meaning that the injury was sure to occur, or was inevitable.

when the trial court's jury instructions were based largely on the defendant's own proposed draft jury instructions. "[A]n appellant should not be allowed to claim as error that which his own action has induced." *Swerdloff* v. *AEG Design/Build, Inc.*, 209 Conn. 185, 191, 550 A.2d 306 (1988). Accordingly, the defendant's challenge relating to the jury instruction on the actual intent standard is deemed waived. *Hughes* v. *Glastonbury*, 19 Conn. App. 411, 412, 562 A.2d 591, cert. denied, 212 Conn. 815, 565 A.2d 535 (1989).[8] Furthermore, the defendant's only exception with respect to the actual intent standard concerned the trial court's failure to provide examples of the two standards that the defendant had set forth in its proposed jury instructions.[9]

"Even if the defendant had some knowledge and may have appreciated the risk that [its] conduct created a strong probability that harm might result, this is not a strong enough showing to meet the 'substantial certainty' test. Thus, if you determine that [the plaintiff's] injuries were only a strong probability or merely likely to result from the defendant's actions, that is not sufficient to establish that they were 'substantially certain' to follow from the defendant's policies regarding cleaning of machines.

"So in sum, there are two ways that the plaintiff can prove that the defendant committed an intentional tort. The plaintiff must prove by a preponderance of the evidence either that the defendant desired to cause his injuries, or that [the] defendant knew that [the] plaintiff's injuries resulting from the cleaning of the machine were substantially certain to occur as a result of its cleaning policies."

[8] In light of the defendant's failure to take exception to the giving of the actual intent instruction, it is of no consequence that the plaintiff's counsel acquiesced in the deletion of the defendant's proposed draft special interrogatory number one, which specifically addressed the actual intent standard. See footnotes 5 and 6 of this opinion.

[9] The defendant's proposed jury instructions provide in relevant part: "[Since this instruction is somewhat complicated, the defendant requests that the court illustrate the distinctions using an example. The defendant suggests the following example.]

"An Example of Negligence

"The distinction between simple negligence and intentional conduct can best be illustrated with an example. If a gas station owner neglected to maintain his gasoline pumps and one day the pump malfunctioned spewing gasoline onto the ground which then caught fire and burned a customer who was filling her car with gas, this would be simple negligence. It would at most be negligent conduct because the two part test for intentional

Specifically, the defendant's counsel took exception to "the failure to include the examples with regard to intentional tort and substantial certainty. We would just like to take an exception to that. We believe that could further clarify this difficult charge."[10]

conduct has not been met. First, the gasoline station owner did not create the situation which caused the injury intentionally but only through neglect. Secondly he did not desire the injury of the customer. While it may be foreseeable that a certain chain of events like the fire I described could occur, one cannot say that it was substantially certain to occur.

"An Example of Intentional Conduct

"If under the same circumstances, however, we learned that the owner of the gasoline station himself observed the leaking gas and the pool of gasoline in the vicinity of the customer pumping gas and threw a lighted cigarette into the pool of gas, igniting the gas, this would be intentional conduct. The conduct would be intentional because it meets the two part test. First it is clear that the conduct of throwing the lighted cigarette into the gasoline was one intentionally undertaken. The second requirement, that the gasoline station owner desired to cause the accident or acted with substantial certainty that the injury would follow is also met. In my example, we cannot be sure that the owner desired the injury to occur but we can say that the accident was substantially certain to occur. He knew the consequences of the act of throwing a lighted cigarette would be to ignite a highly flammable substance or that it was substantially certain that once the cigarette was thrown into the gasoline it would create a condition that would cause the fire to erupt and injure the customer he saw standing near the pool of gasoline."

[10] We are also unpersuaded by the defendant's argument that the plaintiff pleaded and tried the case solely on the substantial certainty standard. In reading the complaint, we follow the modern trend, which "is to construe pleadings broadly and realistically, rather than narrowly and technically. . . . As long as the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party, we will not conclude that the complaint is insufficient . . . ." (Citations omitted; internal quotation marks omitted.) *Normand Josef Enterprises, Inc.* v. *Connecticut National Bank,* 230 Conn. 486, 496, 646 A.2d 1289 (1994).

In our view, the defendant narrowly construes the plaintiff's third amended complaint, which asserted that the plaintiff's injuries "were caused by the [defendant's] wilful, serious and intentional misconduct." Furthermore, the defendant cannot sincerely claim prejudice or surprise in light of the fact that it acknowledged in its trial memorandum that the plaintiff must prove either "that the defendant *intended to injure him* or committed serious and wilful misconduct such that the defendant believed that the plaintiff's injury was substantially certain to follow from the defendant's conduct." (Emphasis added.)

The defendant further argues that the trial court improperly denied its motions to set aside the verdict and for judgment notwithstanding the verdict because the jury's answers to the special interrogatories were inconsistent with the general verdict. Specifically, the defendant claims that the jury's affirmative response to interrogatory number two, without affirmative responses to interrogatory number one or three, requires a defense verdict because: (1) interrogatory number two relates to the question of whether the defendant intentionally created a dangerous condition; and (2) interrogatories numbers one and three, using alternative phrasings,[11] focused on the alternate inquiry, that is, whether the plaintiff's injury was substantially certain to result from the defendant's conduct. The defendant therefore contends that the verdict should have been set aside because the jury's answers reflect that it concluded that the substantial certainty standard was not satisfied. We disagree.

"The role of an appellate court where an appellant seeks a judgment contrary to a general verdict on the basis of the jury's allegedly inconsistent answers to such interrogatories is extremely limited." *O'Leary* v. *Industrial Park Corp.*, 14 Conn. App. 425, 430, 542 A.2d 333 (1988). "To justify the entry of a judgment contrary to a general verdict upon the basis of answers to interrogatories, those answers must be such in themselves as conclusively to show that as [a] matter of law judgment could only be rendered for the party against whom the general verdict was found; they must negative every reasonable hypothesis as to the situation provable under the issues made by the pleadings; and in

---

[11] The phrasing of interrogatory number one is derived from the test set forth in the majority opinion in *Suarez* v. *Dickmont Plastics Corp.*, supra, 229 Conn. 111. In contrast, interrogatory number three used the definitions of "substantial" and "certainty" as stated by this court in *Mingachos* v. *CBS Inc.*, 196 Conn. 91, 101 n.12, 491 A.2d 368 (1985), and relied upon by the dissenting opinion in *Suarez* v. *Dickmont Plastics Corp.*, supra, 123.

determining that, the court may consider only the issues framed by the pleadings, the general verdict and the interrogatories, with the answers made to them, without resort to the evidence offered at the trial." *Belchak* v. *New York, New Haven & Hartford R. Co.*, 119 Conn. 630, 634, 179 A. 95 (1935); see *DeJesus* v. *Craftsman Machinery Co.*, 16 Conn. App. 558, 572, 548 A.2d 736 (1988); *Murteza* v. *State*, 7 Conn. App. 196, 201, 508 A.2d 449 (1986).

"It is not the function of a court to search the record for conflicting answers in order to take the case away from the jury on a theory that gives equal support to inconsistent and uncertain inferences. When a claim is made that the jury's answers to interrogatories in returning a verdict are inconsistent, the court has the duty to attempt to harmonize the answers." *Norrie* v. *Heil Co.*, 203 Conn. 594, 606, 525 A.2d 1332 (1987).

Contrary to the defendant's assertions, we conclude that the question of actual intent was placed before the jury and that the general verdict rendered in favor of the plaintiff is not inconsistent with the jury's answers to the interrogatories. The trial court clearly instructed the jury that it could find for the plaintiff if the jury found intentional misconduct based on either the actual intent or the substantial certainty standard. Furthermore, bearing in mind that the actual intent standard was indeed before the jury, we conclude that interrogatory number two reasonably could be interpreted to embrace the actual intent standard. We point out that the interrogatory does not inquire merely whether the defendant "deliberately put the policy in place," that is, whether the defendant intentionally created the situation. Instead, the interrogatory inquires whether "the defendant deliberately instructed the plaintiff to injure himself based on its policies regarding the cleaning of the plastic injection molding machine?" In our view, the interrogatory fairly could be read to inquire whether

the defendant deliberately caused the plaintiff to injure himself in connection with the defendant's policies with respect to cleaning the machines. Indeed, our conclusion is consistent with the fact that the instruction preceding interrogatory number four regarding contributory fault required the jury to answer that interrogatory only if it "answered 'yes' to *any* of the above questions," to which no exception was taken by the defendant.[12] (Emphasis added.) Moreover, we do not read the interrogatories in isolation, but, rather, in conjunction with the jury instructions; *Norrie* v. *Heil Co.*, supra, 203 Conn. 605; which in this case clearly set forth the actual intent standard. Accordingly, the defendant's argument that the jury's affirmative response to interrogatory number two, without affirmative responses to interrogatory number one or three, requires a defense verdict is unpersuasive.

## II

The defendant next argues that the trial court improperly instructed the jury that the actions of Santiago may be attributed to the defendant under the doctrine of apparent authority to establish the defendant's liability for Santiago's intentional conduct.[13] Specifically, the

[12] Indeed, the trial court underscored that instruction in its explanation to the jury regarding the special interrogatories: "If you have answered 'yes' to any of the above questions then you proceed to answer interrogatory number four and answer that interrogatory. Implicit in that is, is that if you have not answered 'yes' to any of these, don't answer four. Okay? But if you answered 'yes' to one, two *or* three, then you go to number four and you'll notice this one addresses the [plaintiff] . . . ." (Emphasis added.)

[13] We disagree with the plaintiff's assertion that this court should not review the defendant's claim relating to the apparent authority instruction because the defendant failed to provide the specific grounds for its exception. Following the trial court's instructions to the jury, the defendant stated: "Again, Your Honor, just to clarify for the record, with regard to the corporate responsibility [portion], we will take an exception to that charge." The defendant had, however, submitted a proposed jury instruction on corporate responsibility that instructed that an employer could not be liable for intentional conduct based on apparent authority. See footnote 15 of this opinion.

Although the defendant did not provide the specific ground for the exception, the defendant had submitted an appropriate written request to charge

defendant contends that, pursuant to long-standing case law, under the facts of this case attribution of corporate responsibility could only have been predicated on the theory of alter ego. The defendant further argues that because there was insufficient evidence that Santiago was the defendant's alter ego, the trial court should have rendered judgment in its favor notwithstanding the verdict.

A

In its charge to the jury, the trial court instructed that the intentional actions of an employee could be attributed to the defendant if the employee had apparent authority to act on the defendant's behalf or was the alter ego of the defendant.[14] Conversely, the defendant's

and, therefore, this claim is preserved for appeal. *State* v. *Bryant*, 233 Conn. 1, 2 n.3, 658 A.2d 89 (1995); see also Practice Book § 315 ("[t]he supreme court and the appellate court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or exception has been taken by the party appealing immediately after the charge is delivered").

[14] Specifically, the trial court's instructions regarding corporate responsibility provided: "A corporation, like any other employer, may be held liable for the acts or statements of its employees under either the alter ego theory or the apparent authority theory.

"Under the alter ego theory a high ranking official in a corporation can bind the corporation through his actions or statements, even in the absence of authority to act on behalf of such corporation. Thus the alter ego theory focuses upon an employee's position in the corporation and whether it is high enough in the hierarchy of such a corporation to bind the corporation. The theory relies upon the status of the employee and not whether the employee was authorized to act on behalf of the corporation.

"Conversely, under the apparent authority theory, the employee's position and status in the corporation is irrelevant. To bind the corporation, any employee must merely have the express or implied authority to act on behalf of the corporate employer. Under the apparent authority [theory], the corporate employer is the principal and the employee is the agent. The apparent authority must be derived not from the acts of the agent, but from the acts of the principal. The acts of the principal must be such that, one, the principal held the agent out as possessing sufficient authority to embrace the act in question . . . and, two, in consequence thereof the person dealing with the agent, acting in good faith, reasonably believed under all of the circumstances that the agent had the necessary authority to act on behalf of the corporate employer.

proposed jury instruction provided that the defendant could be liable for its employees' actions under only the actual authority and alter ego theories.[15]

In *Jett* v. *Dunlap*, 179 Conn. 215, 425 A.2d 1263 (1979), this court considered whether an employer could be subject to common-law tort liability for a battery that a supervisory employee committed upon a coemployee. This court noted that, as a general rule, "[a]n intentional tort committed upon one employee by another, which causes personal injury arising out of and in the course of his employment, is covered by the compensatory provisions of the [act]." Id., 218. In *Jett*, however, the court carved out an exception to the rule: "If the assailant is of such rank in the corporation that he may

---

"Therefore, if you find that the defendant's employees were the alter ego of the corporation as I have defined that for you above, or were vested to act on behalf of the corporation under an apparent authority theory, also defined above, any evidence of the statements or acts of defendant's employees may be attributed to the defendant and are to be considered the conduct of the defendant."

[15] The defendant's proposed jury instruction with respect to corporate responsibility provided: "A corporation is obviously not an individual, it is an entity. Accordingly, it can act only through its employees. One of the decisions you have to make is whether the corporation has done anything wrong in this case. Now, as I said, the corporation can act only through its employees, but not all employees' actions are considered actions of the corporation. The law states that a high ranking official in a corporation can bind the corporation through his actions. So that if a high level official of a corporation in the course of his employment intends to hurt someone, one can infer that 'intent' can constitute the 'intent' of the corporation. On the other hand, when the employee is a lower level employee of a corporation, such as a supervisor or a foreman, the law does not permit attribution of corporate responsibility for their acts.

"Thus, in this case, to determine whether [the defendant] has done anything illegal, you have to first decide which of [the defendant's] employees have performed an illegal act. Remember, you have to first decide whether an illegal act has been performed by an employee. You then have to determine what the position is of each employee. You then have to decide whether that position of the employee is high enough to attribute corporate responsibility on [the defendant]. If the employee is merely a foreman or supervisor, or at a comparable level, as a matter of law, you cannot conclude that their actions are the actions of the corporation."

be deemed the alter ego of the corporation under the standards governing disregard of the corporate entity, then attribution of corporate responsibility for the actor's conduct is appropriate." Id., 219. Accordingly, the court concluded that "[i]f the assailant can be identified as the alter ego of the corporation, or the corporation has directed or authorized the assault, then the corporation may be liable in common-law tort; if the assailant is only another employee who cannot be so identified, then the strict liability remedies provided by the [act] are exclusive and cannot be supplemented with common-law damages." Id.

Despite the holding of *Jett*, the trial court in this case adopted the plaintiff's proposed instruction on apparent authority and charged the jury that "[a] corporation, like any other employer, may be held liable for the acts or statements of its employees under either the alter ego theory or the apparent authority theory." The court instructed that "under the apparent authority theory, the employee's position and status in the corporation is irrelevant. To bind the corporation, any employee must merely have the express or implied authority to act on behalf of the corporate employer." The instruction further defined apparent authority based on language in *Munson* v. *United Technologies Corp.*, 28 Conn. App. 184, 188–89, 609 A.2d 1066 (1992), which involved the question of whether employees' statements were admissible to bind their employer under the apparent authority theory. Specifically, the trial court instructed: "The apparent authority must be derived not from the acts of the agent, but from the acts of the principal. The acts of the principal must be such that, one, the principal held the agent out as possessing sufficient authority to embrace the act in question . . . and, two, in consequence thereof the person dealing with the agent, acting in good faith reasonably believed under all of the cir-

cumstances that the agent had the necessary authority to act on behalf of the corporate employer."

We conclude that the trial court improperly instructed the jury that it could attribute responsibility to the defendant for Santiago's conduct based on the apparent authority theory. In *Jett*, we specifically stated that a corporate employer may be liable in common-law tort for an employee's injury "[i]f the assailant can be identified as the alter ego of the corporation, or the corporation has directed or authorized the assault." *Jett* v. *Dunlap*, supra, 179 Conn. 219. Nowhere in *Jett* did we signal that an employer may be liable under the apparent authority theory. We decline to adopt the view that an employer may be liable in common-law tort for an employee's actions based on apparent authority. Indeed, only when "the assailant is of such rank in the corporation that he may be deemed the alter ego of the corporation under the standards governing disregard of the corporate entity [is] attribution of corporate responsibility for the actor's conduct . . . appropriate. It is inappropriate where the actor is merely a foreman or supervisor." Id. Accordingly, we conclude that the trial court improperly instructed the jury that the defendant could be found liable under the apparent authority theory.[16]

---

[16] The plaintiff attempts to avoid the consequences of the trial court's improper instruction that the defendant may be held liable if Santiago acted for the defendant under either the apparent authority *or* the alter ego theory by resorting to the general verdict rule. Although these theories were not specifically alleged in the plaintiff's complaint, the plaintiff argues that they were advanced under the allegation that his injuries were caused by the defendant's "wilful, serious and intentional misconduct." We disagree.

"The so-called general verdict rule provides that, if a jury renders a general verdict for one party, and no party requests interrogatories, an appellate court will presume that the jury found every issue in favor of the prevailing party." (Internal quotation marks omitted.) *Hall* v. *Burns*, 213 Conn. 446, 484 n.9, 569 A.2d 10 (1990). Recently, in *Curry* v. *Burns*, 225 Conn. 782, 800, 626 A.2d 719 (1993), this court reconsidered the applicability of the general verdict rule in an endeavor to make it more certain "as to when it applies and when it does not." We recognized that without this certainty,

B

The defendant also argues that the trial court should have rendered judgment in its favor notwithstanding the verdict because the defendant's liability is predicated on the actions of a foreman who was not the defendant's alter ego. Specifically, the defendant asserts that the court disregarded this court's statement in *Jett* v. *Dunlap*, supra, 179 Conn. 219, that attribution of corporate responsibility predicated on the alter ego theory "is inappropriate where the actor is merely a foreman or supervisor."[17] In response, the plaintiff argues that, in

"trial counsel, in the hurry of the trial, may be forced to err on the side of prudence by requesting interrogatories whenever there are factually distinct issues that have been litigated, even though those issues stem solely from denial of different factual allegations of the complaint." Id. Accordingly, we set forth the following scenarios in which the rule would apply: "(1) denial of separate counts of a complaint; (2) denial of separate defenses pleaded as such; (3) denial of separate legal theories of recovery or defense pleaded in one count or defense, as the case may be; (4) denial of a complaint and pleading of a special defense; and (5) denial of a specific defense, raised under a general denial, that had been asserted as the case was tried but that should have been specially pleaded." Id., 801.

In the present case, the plaintiff did not allege either the apparent authority or the alter ego theory in his complaint. Instead, the plaintiff raised these theories in his request to charge submitted to the trial court. Accordingly, we conclude that the general verdict rule does not apply in this case.

[17] Specifically, this court stated in *Jett*: "If the assailant is of such rank in the corporation that he may be deemed the alter ego of the corporation under the standards governing disregard of the corporate entity, then attribution of corporate responsibility for the actor's conduct is appropriate. It is inappropriate where the actor is merely a foreman or supervisor. 2A Larson, [Workmen's Compensation (1976)] §§ 68.21–68.22. Courts in other jurisdictions have adopted this distinction. *Heskett* v. *Fisher Laundry & Cleaners Co., Inc.*, 217 Ark. 350, 355–56, 230 S.W.2d 28 (1950); *Boek* v. *Wong Hing*, 180 Minn. 470, 471–72, 231 N.W. 233 (1930); *Thompson* v. *Jones Construction Co.*, 199 S.C. 304, 310, 19 S.E.2d 226 (1942); *Garcia* v. *Gusmack Restaurant Corporation*, 150 N.Y.S.2d 232, 234 (City Ct. N.Y. 1954). The distinction is based on identification, not agency. If the assailant can be identified as the alter ego of the corporation, or the corporation has directed or authorized the assault, then the corporation may be liable in common-law tort; if the assailant is only another employee who cannot be so identified, then the strict liability remedies provided by the [act] are exclusive and cannot be supplemented with common-law damages." *Jett* v. *Dunlap*, supra, 179 Conn. 219.

the context of a small, family owned corporation in which a foreman has substantial responsibilities and authority, such as in this case, corporate responsibility should not be limited merely because the employee's title is that of foreman. In other words, the plaintiff argues that it is a question of fact whether the managerial employee is sufficiently high in the chain of command to be considered the alter ego of the corporate employer without respect to the employee's formal title. We do not decide this claim because, even if we assume without deciding that, under the circumstances of this case, the jury could have found that Santiago, as the night shift foreman, had been in fact the defendant's alter ego, as we conclude in part III of this opinion, there was insufficient evidence of his intent to injure the plaintiff.

## III

The defendant further argues that the trial court improperly denied its motions to set aside the verdict and for judgment notwithstanding the verdict because the plaintiff had not established the defendant's actual intent to injure. We agree.

The standard for reviewing the denial of motions to set aside the verdict and for judgment notwithstanding the verdict on evidentiary grounds is clear. "Our review of the trial court's refusal to [grant the motions] requires us to consider the evidence in the light most favorable to the prevailing party, according particular weight to the congruence of the judgment of the trial judge and the jury, who saw the witnesses and heard their testimony. . . . The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached their conclusion." (Citations omitted; internal quotation marks omitted.) *Mather* v. *Griffin Hospital*, 207 Conn. 125, 130, 540 A.2d 666 (1988).

Relying on this standard, the plaintiff argues that there existed sufficient evidence from which the jury could have inferred that, based upon the defendant's policies and the nature of the workplace, Santiago, as the defendant's alter ego, specifically had intended to cause the plaintiff to injure himself. Specifically, the plaintiff argues that Santiago's insistence that the plaintiff always clean the hot plastic material from the machines with his bare hands while the machines were still operating, along with the reprimands and threats that the plaintiff received from Santiago the few times he had attempted to turn off the machines prior to cleaning them, served as a basis upon which the jury could have found the defendant's specific intent to injure. We conclude that although this evidence was sufficient to allow an inference that the employer knew that the occurrence of the injury was a substantial certainty; *Suarez* v. *Dickmont Plastics Corp.*, supra, 229 Conn. 109; it was inadequate to support a rational inference that the defendant specifically intended for the plaintiff to be injured.[18]

We begin with the proposition that permitting an employee to sue an employer for injuries intentionally

[18] In part I of this opinion, we characterized the second interrogatory "to inquire whether the defendant deliberately caused the plaintiff to injure himself in connection with the defendant's policies with respect to cleaning the machines." Although we agree that the policy constituted a basis upon which the jury found intent, this finding, although an essential prerequisite under the facts of this case, does not mean that it was sufficient as a matter of law to satisfy the intent to injure requirement. Consequently, we fail to understand why the dissent is "baffled" by the logic of this opinion.

Moreover, although the sympathy of the dissent is laudable, its attempt to resurrect the issue of substantial certainty is not jurisprudentially sound. Although we acknowledge that there was sufficient evidence upon which a jury *could* have found the injury was a substantial certainty, the jury did not make that finding. Moreover, unlike the dissent, having concluded that the jury reasonably *could not have found* that the defendant intended the resulting injuries, we cannot endorse a revival of one theory of the case that has been specifically rejected by the jury solely because it contradicts another jury finding. See *Calabro* v. *Calabro*, 33 Conn. App. 842, 847, 639 A.2d 1046 (1994).

caused to him constitutes "a narrow exception to the exclusivity of the act." *Mingachos* v. *CBS, Inc.*, 196 Conn. 91, 99, 491 A.2d 368 (1985). "Since the legal justification for the common-law action is the nonaccidental character of the injury from the defendant employer's standpoint, the common-law liability of the employer cannot . . . be stretched to include accidental injuries caused by the gross, wanton, wilful, deliberate, intentional, reckless, culpable, or malicious negligence, breach of statute, or other misconduct of the employer short of a conscious and deliberate intent directed to the purpose of inflicting an injury." 6 A. Larson & L. Larson, Workmen's Compensation (1997) § 68.13, pp. 13-12 through 13-13. What is being tested is not the degree of gravity of the employer's conduct, but, rather, the narrow issue of intentional versus accidental conduct.

In defining intent, we have stated that "intent refers to the consequences of an act . . . [and] denote[s] that the actor *desires* to cause [the] consequences of his act, or that he *believes* that the consequences are substantially certain to follow from it. 1 Restatement (Second), Torts § 8A (1965). . . . A result is intended if the act is done *for the purpose of accomplishing such a result* or with knowledge that to a substantial certainty such a result will ensue. 1 F. Harper & F. James, Torts (1956) § 3.3, p. 216. An intended or wilful injury does not necessarily involve the ill will or malevolence shown in express malice, but it is insufficient to constitute such an [intended] injury that the act . . . was the voluntary action of the person involved. *Mingachos* v. *CBS, Inc.*, supra, [196 Conn.] 102. Both the action producing the injury and the resulting injury must be intentional. *Rogers* v. *Doody*, 119 Conn. 532, 534, 178 A. 51 (1935). [The] characteristic element is the design to injure either actually entertained or to be implied from the conduct and circumstances. *Sharkey* v. *Skilton*, 83 Conn. 503, 507–

508, 77 A. 950 (1910)." (Emphasis added; internal quotation marks omitted.) *Suarez* v. *Dickmont Plastics Corp.*, supra, 229 Conn. 108–109. Therefore, to escape the exclusivity of the act, the victim of an intentional injury must rely on the intended tort theory or the substantial certainty theory. Under the former, the actor must have intended both the act itself and the injurious consequences of the act. Under the latter, the actor must have intended the act and have known that the injury was substantially certain to occur from the act.

In the present case, viewing the evidence in a light most favorable to the plaintiff; *Mather* v. *Griffin Hospital*, supra, 207 Conn. 130; the most that can be stated about Santiago's intent is that when he required the plaintiff to clean the machines while they were still in a production cycle and threatened the plaintiff with termination if he disregarded the directive, Santiago intended for the defendant to save money and that the plaintiff's injury was substantially certain to follow from Santiago's conduct. Santiago's actions may indeed have been taken with the knowledge that to a substantial certainty the plaintiff's injury would ensue, but the evidence does not support the inference that they were done for the express purpose of accomplishing such a result.[19] 1 F. Harper, F. James & O. Gray, Torts (3d Ed. 1996) § 3.3, p. 3:9. Substantial certainty centers on whether the employer *believed* the injury was substantially certain to follow the employer's acts or conduct, but when substantial certainty is no longer in the case,

---

[19] The dissent recognizes that the concept of intent in relation to tortious conduct refers to the consequences of the act and not to the act itself; *Mingachos* v. *CBS, Inc.*, supra, 196 Conn. 102; but, nevertheless, collapses this distinction in concluding that Santiago's act, which a jury reasonably could have found was intentional, was done *for the purpose of accomplishing the resulting injury*. Intent, however, is broader than a desire to bring about the physical results. "To bypass the exclusivity of the act, the intentional . . . conduct alleged *must have been designed to cause the injury that resulted*." (Emphasis added.) Id.

"[t]o bypass the exclusivity of the act, the intentional or deliberate act or conduct alleged must have been *designed* to cause the injury that resulted." (Emphasis added.) *Mingachos* v. *CBS, Inc.*, supra, 196 Conn. 102.

The judgment is reversed and the case is remanded with direction to render judgment for the defendant.

In this opinion NORCOTT and PALMER, Js., concurred.

BERDON, J., concurring in part and dissenting in part. I disagree with part III of the majority opinion, in which the court concludes that the trial court improperly denied the motions of the defendant, Dickmont Plastics Corporation, to set aside the verdict and for judgment notwithstanding the verdict because the plaintiff, Alfonso Suarez, failed to establish actual intent to injure as a matter of law. Nevertheless, because I agree with the majority that the trial court incorrectly instructed the jury that the actions of the defendant's foreman, Santiago Santiago, could be attributed to the defendant under the doctrine of apparent authority, I would remand the case for a new trial.

As a preliminary matter, these issues must be reviewed in the context of the plaintiff's background and the setting at the defendant's factory on the second shift, which were before the jury. The plaintiff is a Guatemalan native who, at the time of this incident, had a sixth grade education and was unable to speak English. He, like a significant number of his fellow employees who worked the second shift, spoke only Spanish. The bilingual foreman, Santiago, constituted the management of the defendant on the second shift and was described by Richard Scalise, Jr., then vice president of the defendant, as his "eyes and ears and . . . voice" and as the defendant's "key man." On the second shift, there was no other person that exceeded

Santiago's rank on the corporate ladder. Indeed, Santiago was not only the defendant's key man, but the jury reasonably could have found that that position authorized him to exercise this authority in a tyrannical manner in order to instill fear in the Spanish-speaking employees that they would lose their jobs unless they followed his orders.

I

The principal issue in this case is whether the exclusivity bar of the Workers' Compensation Act (act); General Statutes § 31-275 et seq.; prevents the plaintiff from recovering in this action for damages against the defendant "on account of personal injury sustained by an employee . . . ." General Statutes § 31-284 (a). The definition of personal injury includes an accidental injury "causally connected" with the employment. General Statutes § 31-275 (16) (A). In *Mingachos* v. *CBS, Inc.*, 196 Conn. 91, 100, 491 A.2d 368 (1985), this court "point[ed] out that it is generally agreed that workers' compensation laws were not intended to shield an employer from common law liability for injuries he intentionally inflicted upon his employee." In deciding whether the injury was "intended," we adopted both in *Mingachos* v. *CBS, Inc.*, supra, 101, and in *Suarez* v. *Dickmont Plastics Corp.*, 229 Conn. 99, 108, 639 A.2d 507 (1994), the definition set forth in the Restatement (Second) of Torts—that is, intent "denote[s] that the actor desires to cause [the] consequences of his act, or that he believes that the consequences are substantially certain to follow from it." 1 Restatement (Second), Torts § 8A (1965). In other words, the focus is not upon the act, but on the consequences of the act. See *Mingachos* v. *CBS, Inc.*, supra, 101. In this case, as the majority points out, the jury, through its answers to special interrogatories, rejected the plaintiff's claim that the defendant's conduct was substantially certain to

produce the injury, but found that the defendant desired to cause the consequences of the incident.

## A

In reversing the trial court's judgment and directing a judgment for the defendant, the majority concludes that the defendant's motions to set aside the verdict and for judgment notwithstanding the verdict should have been granted because the plaintiff did not establish, as a matter of law, that the defendant actually intended to cause the plaintiff's injuries. With respect to the issue of sufficiency of the evidence, the majority is short on its analysis and merely concludes that there was insufficient evidence.

I begin my analysis by recognizing the well settled standard for reviewing the denial of motions to set aside the verdict and for judgment notwithstanding the verdict on evidentiary grounds. "Our review of the trial court's refusal to [grant the motions] requires us to consider the evidence in the light most favorable to the prevailing party, according particular weight to the congruence of the judgment of the trial judge and the jury, who saw the witnesses and heard their testimony. . . . The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached their conclusion." (Citations omitted; internal quotation marks omitted.) *Mather* v. *Griffin Hospital*, 207 Conn. 125, 130, 540 A.2d 666 (1988).

"Intent is clearly a question of fact that is ordinarily inferred from one's conduct or acts under the circumstances of the particular case. . . . Thus, whether the actor knows that the consequences of his or her conduct are certain or substantially certain to result from his or her act and still proceeds with the conduct, so that he or she should be treated by the law as though he or she in fact desired to produce the result, is a question of fact for the jury." (Citation omitted.) *Suarez* v. *Dick-*

*mont Plastics Corp.*, supra, 229 Conn. 111. Furthermore, "[q]uestions going to intent and motive, which require the drawing of inferences from proven facts, depend for their resolution upon an assessment of demeanor and credibility that is peculiarly within the province of the trier of fact." *Gorra Realty, Inc.* v. *Jetmore*, 200 Conn. 151, 164, 510 A.2d 440 (1986).

In my view, the jury reasonably could have inferred an actual intent to injure the plaintiff based upon the defendant's workplace policies. The jury heard testimony that the defendant's foreman, Santiago, required that the plaintiff always clean the hot plastic material by placing his bare hands in the machine while it was still operating. Santiago acknowledged in his testimony that the plaintiff was not permitted to use a vacuum cleaner to remove the material because the defendant was concerned about avoiding waste. The plaintiff was also prohibited from stopping the machines prior to the end of his work shift because the defendant wanted to maximize its production.

Furthermore, the jury heard testimony that the plaintiff was reprimanded and threatened for attempting to turn the machines off prior to cleaning the hot material from the machines. The plaintiff testified that Santiago used "very bad words" when he attempted to stop production in order to clean the machine and threatened to terminate his employment. On another occasion, when the plaintiff attempted to clean the machine with a vacuum, Santiago struck the table with a pipe and threatened the plaintiff again. Although the defendant's primary motive in requiring the floormen to scoop the hot material from the machines while the machines were still operating may have been to avoid overtime and material waste, the trier of fact reasonably could have found that the defendant, by requiring the plaintiff to remove plastic with his bare hands, intended the consequences of its orders—that is, to injure the plain-

tiff as a result of the defendant's policies. Indeed, the jury made this finding clear by answering in the affirmative the second interrogatory, which provided: "Has the plaintiff established by a preponderance of the evidence that the defendant deliberately instructed the plaintiff to injure himself based on its policies regarding the cleaning of the plastic injection molding machine?"[1]

When these facts are read in conjunction with the evidence from the plaintiff's engineer, Michael Shanok, with respect to the description of the machine, the conclusion that there was sufficient evidence for the jury to predicate their decision on actual intent becomes obvious. In *Suarez*, the machine was described "as a plunger type horizontal injection molding machine used to melt thermoplastic and thermoset rubber polymers into a mold through the action of a hydraulically operated plunger. Shanok further explained that the material is fed from a small, cylindrical hopper with a conical bottom directly into a feed chute. From the chute, the material falls into an injection chamber. From there, an injection plunger is pushed by a hydraulic ram through a barrel surrounded by electrical heating bands. As the plastic is melted within the barrel, it is further pushed

---

[1] I fail to follow the logic of the majority. The majority concedes in part I of its opinion that the answer to this second interrogatory "fairly could be read to inquire whether the defendant deliberately caused the plaintiff to injure himself in connection with the defendant's policies with respect to cleaning the machines." In other words, the majority concedes that the establishment and enforcement of a workplace policy that required the plaintiff to place himself at risk of injury constituted a basis for finding that the defendant actually intended to injure the plaintiff. On the other hand, in part III of its opinion with respect to the sufficiency of the evidence, the majority holds that proof of a workplace policy requiring the plaintiff to place himself at risk does not constitute an actual intent to injure the plaintiff. This inconsistency baffles me. If the policy requiring the plaintiff to clean the machines with his bare hands can satisfy the intent to injure requirement for part I of the majority opinion, I find it difficult to understand why proof of such a policy is insufficient as a matter of law to establish intent to injure, as the majority concludes in part III of its opinion.

into the mold. The mold is held closed by a damping system, also hydraulically activated. At the conclusion of the molding cycle, the plunger retracts, the mold opens and the molded part is ejected, whereupon the next molding cycle commences.

"Shanok's report further states that the feed chute should be vacuum cleaned when the material hopper is positioned away from the feed chute, so that raw plastic cannot be fed into the machine during cleaning. Nevertheless, the plaintiff allege[d] that the foreman had ordered him to clean up during the completion of production, while the machine was still operating, so that the employer could avoid paying personnel overtime. Pursuant to these orders, he was required to reach into the chute with his hand to remove the remaining plastic pellets in the feed chamber to avoid wasting material. On the day of the accident, the plaintiff claim[ed] that he had put his hand into the energized machine's feed chute while the machine was operating, thereby causing the plunger to move forward in the injection sleeve and partially amputat[ing] two of the plaintiff's right hand fingers." *Suarez* v. *Dickmont Plastics Corp.*, supra, 229 Conn. 102–103.

It is clear that the defendant was playing Russian roulette with the plaintiff and its other employees merely to save production time and material. Because there was not a specific intent that the plaintiff's fingers would be cut off, the majority holds that intent was not satisfied. Nevertheless, in *Mingachos*, this court pointed out that "[t]he intentional injury aspect may be satisfied if the resultant bodily harm was the direct and natural consequence of the intended act." *Mingachos* v. *CBS, Inc.*, supra, 196 Conn. 102. The intention in this case may have been the saving of production time and materials, but the direct and natural consequence of that intention was the plaintiff's injury.

Notwithstanding the majority's narrow view of intent, the outrageous facts of this case require that we leave the determination of whether there was intent to the jury. See *Gorra Realty, Inc.* v. *Jetmore*, supra, 200 Conn. 164 ("[q]uestions going to intent and motive, which require the drawing of inferences from proven facts, depend for their resolution upon an assessment of demeanor and credibility that is peculiarly within the province of the trier of fact"). *Suarez* recognized the need to protect workers in the real world, but the application of those principles in this case undermines that decision. Accordingly, I conclude that the jury reasonably could have inferred from Santiago's conduct, and from the circumstances leading to the plaintiff's injury, that Santiago actually intended to cause the plaintiff to injure himself.

## B

Even if we assume, however, that the majority is correct, in my view, this matter should still be remanded for a new trial. As indicated in part I A of this dissent, our focus in determining intent must be on the consequences of the conduct in question. The majority concedes that there was sufficient evidence to support a finding that the defendant knew that the consequences of its policies were substantially certain to produce an injury. The jury, in finding that the defendant intended the consequences—that is, the injury—logically also found that the defendant believed that the consequences were substantially certain to result from its policies with respect to cleaning the machines. Simply put, the defendant could not have intended the injury as found by the jury, without the jury also believing that the consequences were substantially certain to result under the majority's interpretation of the second interrogatory.[2] The substantial certainty test is a subset of

[2] See footnote 1 of this dissent.

the actual intent standard. For example, an employer cannot intentionally cause an injury to an employee by striking him with a pipe, without also knowing with substantial certainty that he would cause injury to the employee.

It is well settled that "intent is broader than a desire or purpose to bring about physical results. It extends not only to those consequences which are desired, but also to those which the actor believes are substantially certain to follow from what the actor does." W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 8, p. 35. "Thus, a specific intent to injure is not an essential element of an intentional tort where the actor proceeds despite a perceived threat of harm to others which is *substantially certain*, not merely likely, to occur." (Emphasis in original.) *Jones* v. *VIP Development Co.*, 15 Ohio St. 3d 90, 95, 472 N.E.2d 1046 (1984). "It may help to perceive 'substantial certainty' not so much as a substantive test itself nor as a substitute for a subjective desire to injure, [but] as a specie of evidence that will satisfy the [intent] requirement . . . ." *Millison* v. *E.I. du Pont de Nemours & Co.*, 101 N.J. 161, 178, 501 A.2d 506 (1985). In other words, because the jury in this case found that the defendant actually intended to injure the plaintiff, which resulted in the plaintiff's injury, the jury logically was required to conclude that, as a result of requiring the plaintiff to clean the machine with his bare hands, the defendant believed that the plaintiff's injury would result with substantial certainty.

Therefore, the jury's answers to the special interrogatories finding that there was an actual intent to cause the injury that occurred and that the defendant did not know with substantial certainty that it would occur are inconsistent. "Where it is clear that the jury [was] confused and that the verdict rendered is illogical and unreasonable in light of the instructions given . . . or the interrogatories addressed," the verdict cannot

stand. (Citations omitted.) *Labatt* v. *Grunewald*, 182 Conn. 236, 241–42, 438 A.2d 85 (1980). Furthermore, when a "verdict rests upon a factual finding contradictory to another finding of the same issue by the trier the judgment cannot stand." (Internal quotation marks omitted.) *Calabro* v. *Calabro*, 33 Conn. App. 842, 847, 639 A.2d 1046 (1994). Under such circumstances, the verdict must be set aside and a new trial ordered.[3]

I realize that this argument has not been advanced by the plaintiff. This, however, is one of those "truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings"; (internal quotation marks omitted) *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 25, 664 A.2d 719 (1995); and, therefore, constitutes plain error.

Justice requires that the plaintiff be granted a new trial. In *Mingachos* v. *CBS, Inc.*, supra, 196 Conn. 101, and *Suarez* v. *Dickmont Plastics Corp.*, supra, 229 Conn. 108, this court recognized that intent includes not only the intent to cause the injury, but also that such injury was a substantial certainty to occur. The

---

[3] In this respect, the majority cursorily dismisses my argument as "not jurisprudentially sound," although it fails to recognize that it is well settled law, as I have pointed out, that a finding of a specific intent to injure necessarily implies a finding that the injury was substantially certain to result. Accordingly, the jury's finding of actual intent to injure without a finding of substantial certainty is inconsistent.

Instead, the majority simply states that "we cannot endorse a revival of one theory of the case that has been specifically rejected by the jury solely because it contradicts another jury finding." That, however, is exactly my point. As the Appellate Court stated in a case also cited by the majority: "The verdict forms, the interrogatories, the pleadings, and the jury's responses cannot be reconciled. In a case such as the one before us, where the error is clear and is one which may well have been determinative, [the case] should be [re]considered in the interest of justice between the parties." (Internal quotation marks omitted.) *Calabro* v. *Calabro*, supra, 33 Conn. App. 847.

actual intent standard without more, " 'allows employ-
ers to injure and even kill employees and suffer only
workers' compensation damages' "; *Suarez* v. *Dick-
mont Plastics Corp.*, supra, 109; and allows an employer
" 'to "cost-out" an investment decision to kill workers.' "
Id. Under the facts presented to us, however, that is
exactly what happened here. The defendant, in order
to avoid overtime, to have production for a full shift
and to save on material, had an established policy that
the plaintiff and other floormen were required to scoop
out hot material from the machines by placing their
bare hands in the machines while in operation, risking
the amputation of their fingers. The majority allows the
defendant, through its callous workplace policies, to
"cost-out" the business decision to place employees at
risk of serious injury. I therefore cannot agree with the
majority's conclusion.

## II

Because of its conclusion that there was insufficient
evidence to support the plaintiff's verdict under the
actual intent standard, the majority declines to address
the defendant's claim that the trial court should have
rendered judgment in its favor notwithstanding the ver-
dict because the defendant's liability is predicated on
the actions of a foreman.[4] I would conclude that, in the
context of a small, family owned corporation in which
a foreman has substantial responsibilities and authority,
such as in this case, corporate responsibility should not
be limited simply because the employee's title is that
of foreman. In other words, it is a question of fact
whether the managerial employee is sufficiently high
in the chain of command to be considered the alter
ego of the corporate employer without respect to the
employee's formal title.

---

[4] See part II B of the majority opinion.

The jury reasonably could have found the following facts that are necessary to the resolution of this issue. After Richard Scalise, Sr., the owner of the defendant, and his son, Richard Scalise, Jr., then vice president, would leave for the day between 5 and 6 p.m., Santiago oversaw the entire plant operation during the remainder of the plaintiff's shift, which began at 4 p.m. During the overlapping period between the beginning of the night shift and the time that the Scalises would leave for the day, management would give Santiago instructions necessary for the operation of the night shift. As foreman, Santiago was, as Richard Scalise, Jr., testified, the "eyes and ears" of management and the defendant's "key man" and, therefore, was responsible for enforcing workplace rules and procedures. Santiago reported directly to the Scalises and never gave instructions contrary to the Scalises' wishes.

The Scalises always encouraged the employees not to waste material. In the Scalises' view, production would ideally run as closely to the end of the shift as possible, without the machines being shut down fifteen minutes before the end of the shift to clean out the material. Furthermore, the Scalises knew that the machines were not always turned off when the floormen, such as the plaintiff, cleaned out the hot material. As the night shift foreman, Santiago instructed floormen to remove hot material from the hopper while the machines were still operating and admonished the floormen that they were not allowed to remove the material from the machines with a vacuum cleaner. Santiago would also "yell" at the employees if he thought they were wasting material in the cleaning process.

In *Jett* v. *Dunlap*, 179 Conn. 215, 219, 425 A.2d 1263 (1979), this court stated that attribution of corporate responsibility predicated on the alter ego theory "is inappropriate where the actor is merely a foreman or supervisor." *Jett*, however, does not, and never was

intended to, adopt a bright line rule precluding attribution of corporate responsibility based solely on an employee's title as foreman or supervisor. For example, a person whose position is designated as foreman may occupy a position of great authority within the corporate structure that would make him or her the alter ego of the corporation. On the other hand, the title foreman may be ascribed to a mere "straw boss."

The proper inquiry should ascertain the specific responsibilities or level of authority that a particular employee may have within a business organization, without regard to his or her title. See *Griffith* v. *Keystone Steel & Wire*, 887 F. Sup. 1133, 1139–40 (C.D. Ill. 1995) (foremen were not defendant's alter egos because they were only one of several layers of supervisory employees and had no direct influence on control or direction of defendant corporation). Nevertheless, I do not mean to suggest that an employer may be liable under a common-law tort action whenever an employee has intentionally injured a coemployee within the course of employment. Nor do I mean to suggest that the injured employee "would have only to show that the assailant was one notch higher on the totem-pole than the victim . . . ." (Internal quotation marks omitted.) *Jett* v. *Dunlap*, supra, 179 Conn. 218. Instead, the focus should be on whether an employee has such substantial responsibilities, authority or ownership interest to be deemed the employer's alter ego.[5]

---

[5] Justice Peters, in her concurrence, would have us believe that the defendant should be shielded from liability in this matter because the foreman, not the corporate defendant, intended to injure the plaintiff, even though Scalise, the owner, was aware of the practice that caused the plaintiff's injury. I disagree. The determination of whether the actor is the alter ego of the employer is dependent not only upon the formal title of the employee, but also upon the employee's responsibilities and the surrounding circumstances. For example, a vice president of a large bank in which there may be 100 vice presidents would not necessarily be the alter ego of the bank. On the other hand, the vice president of a small family owned corporation, like the defendant in this case, could be the corporation's alter ego.

With these principles in mind, I conclude that the jury reasonably could have found that, under the facts of this case, the night shift foreman, Santiago, was in fact the defendant's alter ego on the second shift when the Scalises were not present. Richard Scalise, Jr., testified that Santiago was vested with broad authority in terms of directing manufacturing operations, training employees, and adopting and enforcing workplace policies. Because the defendant historically had hired numerous Spanish-speaking employees, such as the plaintiff, the defendant relied on a limited number of bilingual foremen to communicate with those employees. Accordingly, the plaintiff received substantially all of his instructions from Santiago. Scalise also testified that the foremen were directly involved in hiring decisions and that the defendant often relied on the foremen's recommendations in making such decisions. Furthermore, Scalise stated that the defendant traditionally had relied on the foremen to provide proper safety training and guidance to employees. Indeed, Scalise acknowledged that not only is the foreman a "key man" in management, but that during the night shift the foreman *is*, in fact, management.[6]

I would conclude that Santiago had such substantial control and authority to be deemed the defendant's alter

Furthermore, Justice Peters relies on *Saphir* v. *Neustadt*, 177 Conn. 191, 209, 413 A.2d 843 (1979), and *Zaist* v. *Olson*, 154 Conn. 563, 574, 227 A.2d 552 (1967), cases involving the piercing of the corporate veil in order to create individual liability. Justice Peters is mixing apples with oranges. In this case, the question is not whether the corporate veil should be pierced, but, rather, whether the foreman's actions in establishing workplace policies, and in enforcing those policies that caused the plaintiff's injury, can be attributed to the defendant.

[6] Moreover, it was reasonable for the jury to conclude in this case that the plaintiff's injury was attributed to the defendant. No one can dispute that the Scalises were the alter egos of the defendant. Santiago was merely following their policies, which, therefore, were the defendant's policies. See *Jett* v. *Dunlap*, supra, 179 Conn. 219 ("[i]f the assailant can be identified as the alter ego of the corporation, or the corporation has directed or authorized the assault, then the corporation may be liable in common-law tort").

ego on the night shift on which the plaintiff worked. I would reverse the judgment of the trial court and remand the case for a new trial.

Accordingly, I dissent.

PETERS, J., concurring. I agree entirely with the conclusion reached by the majority that, in this case, the plaintiff adduced insufficient evidence to establish that the defendant specifically had intended to cause the plaintiff to injure himself. This evidentiary lacuna requires the rendering of a judgment in favor of the defendant.

I write separately only in order to voice my substantial doubts with respect to Justice Berdon's conclusion, in his concurring and dissenting opinion, that the plaintiff adduced sufficient evidence to prove that the defendant's foreman, Santiago Santiago, acted as the defendant's alter ego. Pursuant to the narrow exception to an employer's immunity from common-law tort liability articulated in *Jett* v. *Dunlap*, 179 Conn. 215, 219, 425 A.2d 1263 (1979), the plaintiff cannot recover merely by proving that the defendant gave Santiago apparent authority to instruct the plaintiff about the cleaning of the defendant's machines. Instead, the plaintiff must prove, as *Jett* requires, that Santiago was the defendant's alter ego.

*Jett* prescribes a demanding test for proof of alter ego. "The correct distinction to be drawn . . . is between a *supervisory employee* and a person who can be characterized as the *alter ego* of the corporation. If the [tortfeasor] is of such rank in the corporation that he may be deemed the alter ego of the corporation under the *standards governing disregard of the corporate entity*, then attribution of corporate responsibility for the actor's conduct is appropriate. It is inappropriate where the actor is merely a foreman or supervisor." (Emphasis added.) Id.

Contrary to Justice Berdon, I am not persuaded that the evidence adduced by the plaintiff comes close enough to meeting the *Jett* test to have permitted the jury to make a finding of alter ego as a matter of fact. Foremen and supervisors are customarily responsible for enforcing workplace rules and procedures. It is common ground that the ultimate question is not one of title but, rather, one of function. Nonetheless, the delegation of considerable supervisory and training responsibilities to a foreman, even during a night shift when corporate officials are absent, does not suffice to make a foreman the defendant's alter ego, as *Jett* requires, "under the standards governing disregard of the corporate entity . . . ." Id., 219. Those standards envisage a situation in which the corporation, functionally speaking, has no real existence apart from the individual or entity that controls the corporation's decisions and manages its affairs. See, e.g., *Saphir* v. *Neustadt*, 177 Conn. 191, 209, 413 A.2d 843 (1979) (courts will disregard corporate entity when it is "so controlled and dominated that justice requires liability to be imposed on the real actor" or when it "is a mere instrumentality or agent of another . . . individual owning all or most of its stock"); *Zaist* v. *Olson*, 154 Conn. 563, 574, 227 A.2d 552 (1967) ("[t]here must be such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal" [internal quotation marks omitted]). The evidence cited by Justice Berdon demonstrates no more than that Santiago had apparent authority to give arguably improper instructions to the plaintiff.

Perhaps an argument might be advanced that the standard enunciated in *Jett* is too strict and should be revised. In this case, however, the plaintiff nowhere has adumbrated any such argument. A fortiori, the defen-

dant has had no opportunity to argue for retention of the *Jett* standard.

Until we undertake to revise *Jett*, I disagree strongly with Justice Berdon's characterization of the alter ego rule as one that allows a plaintiff to meet his or her burden of proof by showing no more than that a supervisory employee has substantial responsibilities or authority within the firm. Such a recharacterization of *Jett* inappropriately narrows the distinction between apparent authority and alter ego that *Jett* took pains to establish. It ignores *Jett*'s express holding that proof of alter ego requires evidence sufficient to satisfy "the standards governing disregard of the corporate entity . . . ." *Jett* v. *Dunlap*, supra, 179 Conn. 219.

In my view, this defendant is entitled to have its tort liability measured by the alter ego test enunciated in *Jett*. Nothing in the arguments presented by the plaintiff, or in the factual inferences drawn from the record by Justice Berdon, persuades me that the plaintiff has met his burden under that test.

Accordingly, although I agree with the majority opinion on the principal issues that it addresses, and the judgment it reaches, I disagree with its decision not to consider the merits of the defendant's right to a directed judgment under *Jett*.