[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY NO. 111)
CT Page 8720
On September 14, 1995, the plaintiff's left hand, part of his right thumb and other parts of his right hand were ripped off his arms when they were caught in the defendant's steel slitter machine. The plaintiff brought a one count complaint stating he was so injured while working for the defendant and while attempting to tape the rubber columns of the shearing cylinders of the defendant's slitter machine. Specifically, the plaintiff alleges that the defendant engaged in "willful, serious and intentional misconduct" as follows:
1. The defendant required the plaintiff and other employees to tape the rubber columns located on the shearing cylinders of its Comec slitter machine (Complaint ¶ 5. a.)
2. The defendant required the plaintiff to tape the rubber columns on the Comec slitter machine alone and without the assistance of another employee. (Complaint ¶ 5.b.)
3. The defendant did not provide a protective guard over the rubber columns and knives located on the shearing cylinders of the Comec slitter machine. (Complaint ¶ 5.c.)
4. The defendant refused to institute safer methods for operating the Comec slitter machine, such as using another machine to tape the rubber columns. (Complaint ¶ 5.d.)
5. The defendant never warned the plaintiff of the dangers of taping the rubber columns on the shearing cylinders of the Comec slitter machine. (Complaint ¶ 5.e.)
6. The defendant never instructed the plaintiff on how to operate the Comec slitter machine in a safe manner. (Complaint ¶ 5.f.)
7. The defendant threatened to transfer the plaintiff to the second shift if he did not increase his production on the Comec slitter machine. (Complaint ¶ 5.g.)
8. The defendant failed to have an emergency stop button within reach of an employee caught between the shearing cylinders of the Comec slitter machine. (Complaint ¶ 5.h.) CT Page 8721
9. The defendant failed to have the rotation of the shearing cylinders of the Comec slitter machine operated by a foot switch. (Complaint ¶ 5.i.)
10. The defendant failed to have an emergency stop button operable by foot for an employee whose hands were caught in the shearing cylinders of the Comec slitter machine. (Complaint ¶ 5.j.)
The plaintiff further alleges that the defendant knew or should have known that each of these acts or omissions was substantially certain to cause injury to him or other employees.
In January, 1982, Magnetic Cores Global Steel moved from Bartlett, Illinois, to Bridgeport, Connecticut, bringing five people in that move; namely, Michael Cryne (plant manager), William Klein (plant foreman and supervisor), Donald Dillon (slitter department supervisor), Bruce Miller and Alan Prinner (see transcript of deposition of William Klein, hereinafter Klein Tr.) 10:3-15; 12:11-16, 5:18-20; 6:3-5; 8:18-21; and 90:5-7). Magnetic Cores Global Steel became Trans Steel and Trans Steel became NorMag, Inc. (Klein Tr. 7:5-13 and 10:22-24)
Michael Cryne remains plant manager to date (Cryne Affidavit: job description) and William Klein remains plant foreman and supervisor (Klein Affidavit: job description).
The defendant, acting through William Klein, hired the plaintiff in March, 1994, as a forklift operator on the second shift. (See plaintiff's deposition transcript, hereinafter "Tr.", 9, 13.) The defendant was later transferred to the day shift, and at the request of Klein, began training on a machine known as a Comec slitter. (Tr. 16) The slitter machine cuts large rolls of steel into various widths per customer orders. (Tr. 20) On the day shift, there were usually, but not always, two people working the machine. (Tr. 25).
Before a job was run, the machine had to be set up to the proper specifications. Paperwork was provided which informed the machine operator what was necessary for the set up of the particular job. (Tr. 35) The appropriate roll of metal would be delivered, then the plaintiff and his co-worker, Tim Moales, would load it into the machine. (Tr. 38) The metal was fed into the machine and pulled by hand through the air table then across the rollers. (Tr. 27-28) During this loading process, the machine CT Page 8722 is on and rolling. (Tr. 30-31) Once the metal is properly aligned, one of the operators uses a control button to "jack" it forward, while the other operator makes sure it guides through properly. (Tr. 32-33) The metal is hooked to a line which allows it to spool itself as the cuts come through the machine. (Tr. 34) A rubber sleeve was placed on the roller with the blade to adjust the cut size. (Tr. 39) Then a clearance check was done to make sure that the top and bottom knives were neither too close nor too far apart. (Tr. 40) If a cut of less than one inch was required, the rollers would be taped between the rubber sleeve and the knife. (Tr. 42)
There is a control panel on the side of the machine which includes a start button, other operating buttons, a speed gauge and a knob to control the speed. (Tr. 21-23) There is a kill switch for emergencies. (Tr. 79)
NorMag repeatedly put individuals to work on its small and big slitter machines who had no prior experience as machinists (Diaz Tr. 10:5-8; Klein Tr. 24:12-19; transcript of deposition of Walter Blunt, hereinafter "Blunt Tr.", 6:11-13 and 7:11-15; and transcript of deposition of Evaldo Garcia, hereinafter "Garcia Tr.", 11:12-15). It was NorMag's policy to use on-the-job training to teach the new slitter operators how to run the machines (Klein Tr. 39:10-11 and 75:20-22)
In January, 1995, the plaintiff began a training period under Tim Moales to learn the operation of the big slitter machine (Diaz Affidavit and Diaz Tr. 20:1-2). Donald Dillon had taught Tim Moales how to operate the big slitter machine (Moales Tr. 129:17-18) and that instruction included taping alone to correct a wavy cut in a run of steel (Dillon Affidavit) Whatever training on the big slitter machine Tim Moales received from Donald Dillon, he passed on to Victor Diaz (Moales Tr. 129:24-25 and 130:1-3). At that time, because of the departure of Mr. Dillon, Moales was the only slitter machine operator on the day shift. For the first one or two weeks of the defendant's training period, he simply watched Tim Moales run the big slitter machine alone which included watching Tim Moales tape the machine alone (Diaz Affidavit and Diaz Tr. 21:4-11; 46:11-25; and 47:1-7)
During the course of his training on the big slitter machine, the plaintiff observed the two types of taping that were necessary; that is, taping during an entire set-up process and taping to correct a wavy cut in a run of steel (Diaz Affidavit CT Page 8723 and Dillon Affidavit). Taping during an entire set-up process was occasionally needed, and the plaintiff taped alone on occasion during such a process and observed others tape alone on occasion during such a process (Diaz Affidavit). Taping to correct a wavy cut in the steel happened frequently and was frequently done alone by Victor Diaz and other employees at NorMag (Diaz Affidavit and Dillon Affidavit)
William Klein holds the position of shop supervisor. (Klein Affidavit) His job duties are delineated in his job description, a copy of which is appended to his affidavit. (Klein Affidavit) Klein is not the owner or a majority shareholder of NorMag. (Klein Affidavit) He knew the defendant as an employee of NorMag but was not involved in training the defendant. (Klein affidavit) Klein never told the plaintiff to take any safety shortcuts or any other shortcuts in order to increase production or for any other reason. (Klein Affidavit)
Michael Cryne holds the position of general manager and was in charge of the day shift upon which the plaintiff worked at the time of the jury. (Tr. 37; Cryne Affidavit) His job duties are delineated in his job description, a copy of which is appended to his affidavit. (Cryne Affidavit) Cryne is not the owner or a majority stockholder of NorMag. (Cryne Affidavit) Cryne knew the plaintiff as an employee of NorMag but was not involved in training him.
Practice Book § 17-49 provides that summary judgment "shall be rendered forthwith if the pleadings, affidavits and other proof submitted show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Haesche v. Kissner, 229 Conn. 213, 640 A.2d 89
(1994). A "material fact has been defined adequately and simply as a fact which will make a difference in the result of the case." Catz v. Rubenstein, 201 Conn. 39, 48, 513 A.2d 98 (1986). The court's function in a summary judgment proceeding is not to decide issues of fact, but rather to determine whether they exist. Telesco v. Telesco, 187 Conn. 715, 718, 447 A.2d 752
(1982).
The motion for summary judgment is designed to eliminate the delay and expense of litigating an issue when there is no real issue to be tried. Wilson v. New Haven, 213 Conn. 277, 279,567 A.2d 829 (1989). The movant has the burden of showing the absence of any genuine issue of material fact which, under applicable CT Page 8724 principles of substantive law, entitle it to judgment as a matter of law. State v. Goggin, 208 Conn. 606, 615, 546 A.2d 250 (1988).
In moving for summary judgment against a party who bears the ultimate burden of proof at trial, as is the case here, the movant's burden will be satisfied if it can point to an absence of evidence to support an essential element of the nonmoving party's claim. Goenaga v. March of Dimes Birth Defects Found.,51 F.3d 14, 18 (2d Cir. 1995).[1] The movant, therefore, may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case. Gallo v.Prudential Residential Services, Ltd. Partnership, 22 F.3d 1219, 123-1223-1224 (2d Cir. 1994); Dister v. Continental Group, Inc.,859 F.2d 1108, 1114 (2d Cir. 1988).
The defendant, in its Reply to Plaintiff's Objection to Defendant's Motion for Summary Judgment, relies heavily on the case of Victor Recalde v. Emhart Industries, Inc., 1999 WL 72120 (Conn.Super. 1999), wherein Judge Corradino granted the defendant's motion for summary judgment in a case where the plaintiff was alleging intentional conduct on the part of the defendant which created a situation where injury was substantially certain to result as an exception to the exclusivity of the remedy provided under the Worker's Compensation Act.
In that case Judge Corradino extensively reviewed cases both from Connecticut and other jurisdictions that have adopted the substantial certainty test. It is a scholarly opinion and will be relied upon heavily by this court in determining the same question here. The one thing that is clear from his opinion is that each case is fact specific and must be determined in the presence or absence of factors that would lead to a prima facie case for substantial certainty.
In Recalde the court then analyzed the facts and affidavits in accordance with the substantial certainty test adopted by our Supreme Court in Suarez v. Dickmont Plastics Corp.,242 Conn. 255, 280, in particular the two aspects of the test: (1) substantial certainty from the point of view of physical causation; and (2) the employer's belief in the substantial certainty of injury. It differentiated the facts in Suarez, where the trial court's granting of summary judgment was reversed, and the facts in Recalde, wherein he granted summary judgment. That is precisely what the court here must do. In Suarez the employer required the employee to clear the machine while it was in CT Page 8725 motion, refused to allow safer cleaning methods and refused to equip the machine with a protective cover. The plaintiff expert described how the defendant's procedures violated OSHA regulations and averted safety standards and that it was clear in his mind that the injury suffered was a predicate and probable event. It is of interest that in Suarez there was no history of prior accidents.
Before dealing with that analysis, the court must first deal with another claimed basis for granting summary judgment here and that is the defendant's claim that Moales, Klein and Cryne are not the alter egos of NorMag. The specific claim set forth on pages ten and eleven of the defendant's initial brief is that the plaintiff must prove that he was instructed to operate the machine in the manner which caused the injury by the `alter ego' of NorMag. No mention of this claim was made at oral argument, it is not mentioned anywhere in the defendant's Response to the Plaintiff's Objection to Summary Judgment, and the issue is not mentioned at all in Recalde. The court questioned defendant's counsel who replied that he was still pressing the issue. Other than for the fact that in the Klein and Cryne affidavits they claim they were not the owner's or majority shareholders of NorMag, there is no other documentation describing the corporate structure of NorMag. Certainly, from the job descriptions, they seemed to have all of the management and supervisory roles for the corporation at least at its Bridgeport location. This court simply does not accept the proposition that unless the plaintiff can establish that Moales, Klein and Cryne were the alter egos of NorMag that he can not prove the requisite elements as set forth in Suarez to establish an exception to the exclusivity doctrine. In addition, there is a totally inadequate factual basis presented to determine the issue of alter ego.
In addition, Cryne and Klein, by their own job descriptions attached to their affidavits, demonstrate they are the number one and number two persons in authority representing the defendant in all decisions in Bridgeport. Whether a managerial employee is sufficiently up the chain of command to be considered an alter ego is a question of fact. Suarez, supra, 242 Conn. 255, 276. At a minimum, this court concludes that there is a genuine issue of fact in dispute concerning this subject.
The main thrust of the defendant's argument is twofold: (1) there is no evidence that the defendant intended the plaintiff to be injured under the intended tort theory; and (2) the plaintiff CT Page 8726 can not establish an exception to the exclusivity doctrine under the substantial certainty test.
For its argument that there is no evidence to support that NorMag intended for the plaintiff to be injured, it attached affidavits of Cryne and Klein to the effect that they never instructed or authorized Moales to train the plaintiff to tape the rollers alone and while the machine was energized. It further refers to the plaintiff's deposition at page 101 where he, in answer to questions, replied that neither Cryne, Klein or Moales specifically told him he "had to" or "got to" tape the machine alone while the rollers were going. It is interesting to note, however, on that same page and the next, the plaintiff denies that Moales ever told him not to tape alone because it was dangerous.
For its argument that the plaintiff can not establish liability under the "substantial certainty test", the defendant again attempts to support its position solely with the affidavits of Cryne and Klein and the deposition of the plaintiff Diaz. In its brief in support of its Motion for Summary Judgment, it continuously uses the phrase "there is no evidence that" and "the record is devoid of evidence that." That is hardly significant because at the time this motion was filed the only significant items of record were the complaint, answer and special defense along whatever documentation was attached to the motion. Evidence is usually reserved for the time of trial. The Cryne and Klein affidavits proclaim that taping the rollers alone was in violation of company policy, but that policy was not produced. It is unclear as to whether that policy was oral or written and if either, how or if it was ever communicated to persons working the slitter machines. The plaintiff produced evidence by affidavit that there was no rule, oral or written, prohibiting one man taping of the slitter machine or in fact anything regarding taping of the slitter machines. (See Diaz deposition and deposition of Richard Kaletsky, the defendant's expert.)
The plaintiff has in its objection to the Motion for Summary Judgment attached 17 exhibits comprises of affidavits and deposition testimony of several persons who have direct knowledge of the usage of the slitter machines at the defendant's premises.
Johnny Matos (ex. H) stated that he had observed Moales, Diaz and the second shift slitter operator do one man taping while the machine was energized on the big slitter machine. One man taping CT Page 8727 of the small slitter machine was routine. (See affidavits of Diaz, Dillon, Jose Cruz, James Raiford, Jose Munoz and Luis Andino.) William Klein never told Diaz to avoid any particular practice while taping. (Klein deposition, 19, 80.) Cruz, Andino, Matos and Munoz all saw Diaz, Moales and at times Dillon do one man taping of the big slitter machine. Cruz saw Moales teach the plaintiff one man taping of the big slitter machine. The plaintiff Diaz was never instructed by anyone at NorMag how to work safely around machines and was never given an Employee Safety Manual during his employment. (See Diaz' affidavit and deposition transcript.)
On February 13, 1991, Israel Trujillo, a big slitter operator at NorMag, suffered a degloving injury of his left hand including amputation of parts of his thumb, index finger, ring finger and little finger while taping the big slitter machine (Dillon Affidavit #13, Blunt Tr. 55:6-8 and Garcia Tr. 45:16-18) Following that traumatic injury, the position of the employee taping the big slitter machine was changed from one side of the shearing cylinders to the opposite side of the shearing cylinders (Blunt Tr. 21:1-17 and Klein Tr. 94:12-25 and 95:1). The emergency stop button which is located on the side of the shearing cylinders where Israel Trujillo stood when he was injured was supposed to have been moved to the opposite side of the shearing cylinders when the position of the employee taping the big slitter machine was moved to the opposite side of the shearing cylinders in 1991 (Dillon Affidavit #18). The defendant's slitter department supervisor, Donald Dillon, and other employees complained the emergency stop button should be moved to the side of the shearing cylinders where the slitter operators now stood, but the emergency stop was never moved by NorMag (Dillon Affidavit #18 and Moales Tr. 110:14-17).
The court will now incorporate pages nine through 16 of the plaintiff's Brief in Opposition.
The big slitter machine was the key to production at NorMag (Diaz Affidavit #11) as it provided steel to other stations throughout the NorMag plant. Michael Cryne and William Klein would bring customer orders to the big slitter machine, would constantly come out to the machine and check on the production level, and would come Out to the slitter operators with rush jobs requiring that the set-up be changed and anew set-up be put on (Diaz Affidavit #11). Everything around NorMag was always rushed and the emphasis was always was to just get the job done (Dillon CT Page 8728 Affidavit #20 and Diaz Affidavit #31).
Victor Diaz was pressured by William Klein to keep up a high level of production on the big slitter machine (Diaz Affidavit #16). William Klein would always come to the big slitter machine the first thing in the morning and often ask Victor Diaz or Tim Moales why ore steel had not already been cut (Diaz Affidavit #17).
William Klein was always pushing employees to work faster (Munoz Affidavit #12), and he would frequently yell at employees to curtail their breaks (even bathroom breaks) and get back to work faster (Cruz Affidavit #11). Both William Klein and Michael Cryne would yell at employees if they felt those employees were not working fast enough (Matos Affidavit #9).
There were rush orders in the slitter department (Klein Tr. 275:24-25 and 276:1-9).
There were orders that had to be gotten out to scheduled trucks (Blunt Tr. 58:3-9 and Ventura 48:16-20). The slitter operator would be told to catch up on production (Blunt Tr. 57:24-25, 58:1; 58:12-16; 59:3-5; Moales Tr. 50:3-5; Klein Tr. 255:22-25; and 256:1-20). Michael Cryne had told Tim Moales he (Moales) was behind schedule (Moales Tr. 53:14-16). Michael Cryne and William Klein would often tell Walter Blunt to "kick it up a little bit" (Blunt 58:12-25 and 59:1-8).
During the spring or summer of 1995, Tim Moales took a one week's vacation leaving Victor Diaz to run the big slitter machine alone and do the taping alone on most occasions (Diaz Affidavit #18). William Klein told Victor Diaz he would have to do all aspects of the operation of the big slitter machine by himself during Tim Moales's vacation (Diaz Affidavit # 21). During that week of Tim Moales's vacation, William Klein saw Victor Diaz alone taping the bottom shearing cylinder of the big slitter machine and asked Victor Diaz how he was doing (Diaz Affidavit #22). Luis Andino saw Victor Diaz tape the slitter machine alone during Tim Moales's vacation (Andino Affidavit #4).
During the summer of 1995 while the NorMag plant was on shutdown, Victor Diaz complained to William Klein that the big slitter machine did not stop quickly enough when the stop button was pushed. Klein responded the speed at which the slitter machine stopped could not be adjusted (Diaz Affidavit #s 23 and CT Page 8729 24). Walter Blunt had also complained the big slitter rolled to a stop rather than stopping abruptly when power to the machine was cut (Blunt Tr. 72:10-19).
During 1995, Tim Moales was allowed to leave the NorMag plant early on several Fridays, leaving Victor Diaz alone to run the big slitter machine and do any necessary taping (Diaz Affidavit #25). Also during 1995, NorMag required Victor Diaz to work through the normal employee lunch period to keep the big slitter machine running which caused Victor Diaz to tape the machine alone on occasion (Diaz Affidavit #26 and Garcia Tr. 69:14-25 and 70:1-4).
It was NorMag's policy to send Tim Moales to other areas of the slitter department in 1995 which policy required Victor Diaz to run the slitter machine alone and tape alone on occasion (Diaz Affidavit #29 and Blunt Tr. 13:1-8).
Two-man taping of the big slitter machine was not specifically instructed at NorMag (Garcia Tr. 31:19-24). Tim Moales did not specifically instruct Victor Diaz that taping the big slitter machine was a two-manjob (Moales Tr. 134:13-18). Nevertheless, taping the slitter was recognized as a dangerous job (Blunt Tr. 46:11-16; Moales Tr. 70:10-13; and Garcia Tr. Garcia Tr. 68:1-8).
One-man taping of the slitter machines was recognized as going to result in injury. From the Moales's deposition: "Q. Is it fair to say you don't tape alone because if you do, you are going to get hurt? A. Yes. Q. Is there any question in your mind about that, Mr. Moales? A. No. There's no question at all." (Moales Tr. 70:20-25). From the Ventura deposition: "Q. As far as you are concerned as a machinist having worked on this machine for seven years, it would be absolutely unsafe to tape this machine by yourself to put a build up of tape on; is that correct? A. Right Yes." (Ventura 43:16-21). From the Blunt deposition: "Q. You are telling us that you know that if somebody tapes alone ---- A. you can get hurt. Q.-he's going to get hurt; is that correct? A. Yes. Q. You have been informed of that by your superiors? A. Yes. Q. If you tape alone, you are going to get hurt? A. Right. Always." (Blunt Tr. 46:17-25 and 47:1). From the Kaletsky deposition: "The practice of one-man taping at least can be quite dangerous." (Kaletsky Tr. 46:7-8). And again: "If we are talking about the fact that the machine is run-taped, run-taped and there was a significant lack of control, CT Page 8730 I would be extremely concerned." (Kaletsky Tr. 47:25 and 48:1-3). And again: "I'd be of the opinion it's an unsafe practice if a man or woman is taping on moving rollers where he or she might be pulled in. I'm going through all of these words to make it clear, if there was no control as to how it would be able to stop before the injury became significant." (Kaletsky Tr. 59:2-7).
A set-up of the big slitter machine can take one-half hour to two hours (Klein Tr. 258:2-6). A set-up time depends, in part, on the speed of the slitter operator (Klein Tr. 258:4.(6). During the time the slitter is being set up, no steel is being cut.
William Klein was asked during his deposition: "Q. Did you ever suggest to Mr. Diaz he had to work faster in the set up process because the (slitter) machine also had to produce the steel orders? A. Well, I don't know how I would — how, you know. I might have said something to that effect . . ." (Klein Tr. 25 8:22-25 and 259:1). And again from William Klein's deposition; "Q. Did you tell Victor (Diaz) he was going to move to nights on the small machine because the production didn't justify having two men on the big (slitter) machine? A. I may have said that. Yes." (Klein Tr. 260:6-9).
The emergency stop on the big slitter machine is 43" to 45" from the left side of the shearing cylinders and is behind those cylinders (Ventura Tr. 61:2-20). That emergency stop was for the use of an employee taping the big slitter machine from the position (on the opposite side of the shearing cylinders) where Victor Diaz was on September 14, 1995 (Klein Tr. 105:25 and 106:1-4). When the taper was moved from one side of the shearing cylinders to the other side, William Klein determined the emergency stop was still reachable from the taper's new position across the knives of the shearing cylinders and therefore did not have to be moved (Klein Tr. 107:12-25 and 108:1-8).
However, William Klein said it would be unsafe for someone to reach across the moving cylinders to hit the emergency stop (Klein Tr. 112:19-25 and 113:1-2). In William Klein's deposition, he stated he had never tried to hit the emergency stop from the taper's position to stop the shearing cylinders stating: "Who in their right mind would stand in front of a set of rolling knives?" (Klein Tr. 109:11-19). William Klein testified at his deposition that a person standing on the taper's side of the shearing cylinders and at the left hand side of the shearing cylinders could not reach the emergency stop with their left CT Page 8731 hand. (Klein Tr. 120:14-17). Walter Blunt, who hit the emergency stop on September 14, 1995 when Victor Diaz was injured, testified at his deposition that Victor Diaz could not reach that emergency stop (Blunt Tr. 69:12-17).
The emergency stop, when pressed, allowed the shearing cylinders to rotate once or twice more (Ventura Tr. 66:10-15 and Garcia Tr. 77:10-15 and 79:24-25 and 80:1-2).
There was no guard on the big slitter machine at the point the taper taped the shearing cylinders (Moales Tr. 103:21-24).
On the morning of September 14, 1995, Victor Diaz reported to work at the slitter department and finished running a coil of steel through the big slitter machine which coil had been left by the night shift (Diaz Affidavit # 33). He noticed one of the cuts in the steel was wavy and required taping (Diaz Affidavit # 34). Tim Moales was at the banding line and Victor Diaz began to tape the rubber column next to the knife producing the wavy cut (Diaz Affidavit #s 36 and 35).
Victor Diaz set the speed of the shearing cylinders and obtained a roll of fiber filament tape and a pair of scissors and positioned himself in front of the shearing cylinders on the side of the cylinders tapers had used since Israel Trujillo's traumatic amputation injury. (Diaz Affidavit #37). Victor Diaz then held the roll of tape in his right hand and stretched out a length of tape with his left hand and with his left thumb and forefinger applied the tape end to the rotating shearing cylinder on the rubber column next to the knife. (Diaz Affidavit #s 38 and 39). As the tape began to rotate away from him, Victor Diaz reached down to grab the scissors in preparation to cut the tape (id). He immediately felt the base of his right forefinger burn as the slitter machine pulled the roll of tape unusually hard, spinning the inside cardboard edge of the roll of tape across his hand (Diaz Affidavit #40). He was pulled toward the unguarded rotating knives of the shearing cylinders and immediately lost his balance as there was no room to step forward. He tried with his left hand to grab a metal bar on the air table of the slitter machine but could not do so. He tried to keep his chest away from the rotating knives as he was pulled up and over those knives. He tried to pull his right hand out of the roll of tape but could not as he had lost his balance and was trying to brace himself away from the knives of the slitter machine. He tried to reach the emergency stop button with his CT Page 8732 left hand but could not.Victor Diaz screamed for anyone to stop the big slitter machine as he was being pulled into it. His right hand was pulled over the top of the top shearing cylinder and twisted downwards and backwards (palm up). His right hand entered between the top and bottom shearing cylinders at the time the roll of tape came free of his right hand. He saw Walter Blunt hit the taper's emergency stop button. At the same moment, Victor Diaz reached for his right hand with his left hand. The activation of the emergency stop button did not immediately stop the knives and rubber columns of the shearing cylinders from turning, and his left hand was pulled into the knives, and his right hand continued to be pulled into the knives and rubber columns. (Diaz Affidavit #s 40 through 51).
The employees of NorMag rushed to Victor Diaz and first took the tightener nuts off the big slitter and tried to remove the knives and rubber columns of the set-up to extract Victor Diaz (Moales Tr. 60:9-16). Other employees tried to pry open the shearing cylinders which crow-bars, but the crow-bars simply bent (Andino Affidavit #s 11 and 12). Next the tow motor operator inserted the forks of his tow motor between the shearing cylinders of the big slitter machine and, after a few unsuccessful attempts, was able to jack the shearing cylinders apart enough for Victor Diaz to free himself from the big slitter machine (Diaz Affidavit #58).
In addition, the plaintiff, on June 22, 1999, filed a Supplemental Response to the pending motion attaching an affidavit of their expert Michael F. Miller, which incorporated the plaintiff attorney's disclosure of the contents of his investigation and opinion. That opinion generally concludes that based on all the violations of OSHA and ANSI standards concerning the absence of any guarding of the machine that the employer NorMag would have been aware of the hazards of one and two men taping on the slitter machine and that there was a substantial certainty that an employee would have been injured while performing these tasks.
On June 28, 1999, the date of the oral argument of this motion, the defendant filed a lengthy reply to the Plaintiff's Objections wherein he attempts to set forth the defendant's version of the events on September 14, 1995. He states on page two that Mr. Moales "was working with the plaintiff on the big slitter machine when the accident occurred." That is simply not true or at the least it is a disputed issue of fact. In fact, the CT Page 8733 Moales affidavit dated June 24, 1999 states he had left Diaz alone for one to two minutes, was thirty to forty feet away from him giving instructions to other workers when the accident happened. All the other affidavits support the fact that this was not unusual.
Defense counsel further claims on page six, "There is more over no dispute that the plaintiff was either expected or directed to operate the machine by himself." That again is simply untrue or at least a genuine issue of disputed fact. He then goes on to dissect each of the affidavits of employees or former employees of the defendant. He describes most of the affidavits as "irrelevant" even though the facts contained therein support a common practice to tape the slitter machine alone. With reference to the Matos' affidavit, whenever he claims that he saw several individuals on several occasions do one man taping with the machine energized without the help of any other person, defense counsel, on page ten, says, ". . . it is not clear what he [Matos] means." If that does not by itself demonstrate a genuine issue of fact in dispute, I can not imagine what else would. His repeated efforts to question each affidavit, what each means or does not mean and what all the surrounding circumstances were, all lead to the conclusion that there may be several genuine disputed issues of fact.
The defendant NorMag basically argues through its general manager and plant supervisor that one man taping never occurred. It further argues that neither of them ever instructed the plaintiff to tape alone and while the machine was running and they never intended to injury Mr. Diaz. "A result is intended if the act done for the purpose of accomplishing such a result or with knowledge that to a substantial certainty such a result will occur." Suarez, supra, 229 Conn. 99, 108-109.
The plaintiff, on the other hand, cites the earlier 1991 injury to Israel Trujillo on the unguarded slitter machine resulting in traumatic amputation and the defendant's solution to move the operator to the other side of the machine without either adding a guard or moving the emergency stop which was now further from the operator. He further relies on the several affidavits of former and present employees that one man taping while the machine was energized was common. The defendant's assignment of employees on either the day or night shift, as well as vacation schedules and weekly work schedules, made it quite obvious that one man taping would occur on a machine that was so critical to CT Page 8734 its production. The plaintiff cites the absence of any written or oral rule prohibiting one man taping and the fact that neither the company's operations manual or Employee Safety Manual even addresses taping.
All of this leads the court to conclude that at least on the "substantial certainty test" that several genuine issues of fact exist as to both the substantial certainty from the point of view of physical causation that an injury would occur and the employers knowledge of and belief in the substantial certainty of injury.
For these reasons, the Motion Summary Judgment is denied.
GORMLEY, J.