[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORMANDUM OF DECISION
This case arises out of injuries sustained by the plaintiff at approximately 10:30 p.m. on August 8, 1997, while she was acting as a server in a Red Lobster Restaurant located at 4485 Main Street in Bridgeport owned by the corporate defendants. A worker's compensation claim was filed on her behalf and, as a result, the compensation carrier has paid medical bills in the amount of $47,712.61 and indemnity payments to her in the amount of $23,850.09. The injuries occurred as a result of the plaintiff falling in a wet area inside the restaurant kitchen, the main injury being a distal radius fracture of the left wrist requiring an initial closed reduction and subsequent left distal radius osteotomy with iliac crest bone grafting for a malunion secondary to the fracture.
The parties are at odds concerning many of the factual claims made in the complaint, but the main thrust of the defense is its Special Defense that the Revised Complaint sounds in simple negligence and is barred by the exclusivity provisions of the Connecticut Workers' Compensation Act, General Statute § 31.284, et seq.
In the revised complaint, the plaintiff, who was a waitress, claims she entered the kitchen from the dining room just before the fall, carrying a few dessert dishes from her last table. The restaurant, which serves anyone who enters before 11:00 p.m. on Friday nights, which this was, still had a good number of customers being waited on and some had not been served their food yet. The plaintiff's work area, which was to the rear of the restaurant, had, however, been closed by the manager.
The plaintiff further alleges that some time before she fell, the assistant manager on duty, Kevin Lipinski, directed the kitchen staff to start the breakdown phase of cleaning the kitchen early because he wanted to leave early and at his direction someone on the kitchen staff took up the mat(s) from the kitchen floor near the dishwasher and garbage bins and cleaned the area with soap and water. The floor in this area was some kind of tile and the rubber mats were flat and not perforated. Plaintiff's witness, Douglas Miles, does confirm that Lipinski asked him to speed up the cleaning process because he had to go somewhere, whereas Lipinski testified he had no recollection of saying that.
The plaintiff further claims it was the practice of the defendants, through their agents and employees, to wait until after closing time and CT Page 9164 after the servers had brought all the dirty dishes into the kitchen before the kitchen cleanup began. Several of the plaintiff's own witnesses disputed that. The plaintiff then labeled the actions of the defendant as "wilful and serious misconduct" by "their total disregard or indifference for the safety and rights of their employees." She further alleged that prior to her fall that "several employees slipped and fell near the dishwasher and garbage bins under similar wet and slippery conditions." She lastly alleges that her injuries were "substantially certain to follow from the actions of the defendants, their agent, servants, and/or employees and including but not limited to the Manager on duty, Kevin Lipinski." That language, "substantially certain", was obviously utilized to come within the exception to the exclusivity doctrine set forth in Suarez v. Dickmont Plastics Corp., 242 Conn. 255,280 (1990)
As part of her proof, she produced a portion of a video as well as a short typed segment of it (see plaintiff's exhibits B and C) wherein the defendants acknowledged the high incidence of slip and falls generally and, as is pertinent to this case, that wet spots on the floor can lead to disaster for an employee. This evidence cuts both ways. In one way it proves that the defendants were aware of the problem of slips and falls, but on the other hand, were trying to do something about it.
The plaintiff produced as a witness the present general manager of the Bridgeport restaurant, Kurt Geissinger, who was not the manager when she fell. He basically described what he does now if he is closing the restaurant. He testified the company is aware of the dangers of slip and falls on wet floors, that the safety of workers is very important to the defendants and its managers are constantly vigilant in making sure that the premises are safe.
More particularly, the plaintiff testified that she was an experienced waitress and had been in the defendant's employ since the restaurant opened in 1996. She described the kitchen on Friday nights as chaotic with food and water on the floor although she acknowledged the policy was to pick up and clear the floor "as we go." The restaurant does 600-700 meals on a Friday night.
The plaintiff adopted the blackboard drawing of the kitchen done by Mr. Geissinger as representing what the kitchen looked like. To enter the kitchen from the dining room, you go through a door, enter a hallway a few feet long, turn a corner and go through a doorway leading into the kitchen. Immediately on the left is the dishwasher station which had one or more garbage bins in front of it. The servers, on returning dishes to the kitchen, scrape the excess food into those bins, put the silverware and dishes on the counters in front of them and the glasses on a higher CT Page 9165 rack. They are then taken by the dishwasher and placed into racks, sprayed with a hose to remove larger particles and then cleaned. Sometimes the hose water splashed out in front of the garbage bins. If a waitress in cleaning her dishes misses the garbage bins, the food or other contents of the plates and glasses go on the floor. Simply put, this is not like standing in front of a counter at Tiffany's.
When the restaurant first opened, there were no mats in that hallway or in front of the garbage bins and dishwasher station. After complaints by the employees concerning slipperiness were made known at a meeting, one mat was placed in the hallway and a smaller one was placed in front of the dishwasher station.
The plaintiff testified that her station was closed by Kevin Lipinski at 10:20 p.m., and she had one table left having dessert. In the next two to three minutes, she went into the kitchen near the dishwasher station two times. On the first trip, she recalls bath mats being on the floor and no incident took place. She went back into the dining room, picked up some more dishes without a tray and shortly returned to the dishwasher area of the kitchen to drop them off. As soon as she entered the kitchen, she slipped backwards and fell, breaking her left wrist trying to break her fall. She immediately noticed that the small mat that had been in front of the dishwasher station was not there and she could feel the water on the floor because her clothes became wet. She was later taken to the hospital by ambulance. Apparently, the mat in the hallway had also been moved but she did not fall there.
The plaintiff admitted she had not fallen at that location before, that no one else fell that night there, that she saw no one cleaning or squeejeeing the floor, but she concluded it had been done because it was wet. Only two to three minutes passed from when she last saw the mat down to when she fell.
The plaintiff presented the testimony of several other employees who will be briefly referred to. A Dan Coreano was just behind her when she fell, but did not actually see her fall. He described the floor where she fell as wet, that the two mats had been removed and were on the side out of the way, but he did not see and does not know if anyone had cleaned the floor in front of the dish station.
Geraldine Wright, the plaintiff's co-server, had just passed the plaintiff by the kitchen doorway going in the opposite direction before she fell. She did not note water on the floor where the plaintiff fell, was not sure about the mats and, although she felt the kitchen breakdown had begun, she did not see anyone doing anything and the floor was not slippery. CT Page 9166
Hope Edwards, another server, heard the plaintiff fall, saw the mats removed a minute or two before, described the floor area at the place of the fall as wet, but not much, and was sure the floor in that area had not been washed with soap and water.
Other employees testified that the kitchen breakdown began as much as one hour before the restaurant closed. When it began was usually at the discretion of the closing manager and his decision was usually based on the level of activity in the dining area and whether meals were still being served. The breakdown usually began in the back of the kitchen with the sweeping of the floors and cleaning stoves and fryers. The last thing usually done was the washing of the floors with soap and water and the area adjacent to the dish area was the last to be cleaned.
Douglas Miles was in charge of the kitchen on the night in question and testified that Lipinski did ask that the kitchen breakdown be speeded up that night. He remembered that the mats near the dish area had been picked up by someone on the staff but he did not know if the area in front of the dish area had been washed before the plaintiff's fall and based on the fact that the mats had just been picked up, it is unlikely that it could have been.
In reviewing the allegations of the complaint, the plaintiff has proven some of her allegations and has failed to prove others. It does appear that the night manager, Kevin Lipinski, began the kitchen breakdown somewhat earlier than usual and clearly before 11:00 p.m. However, it was established that there was no fixed policy on when the breakdown should begin, and it was usually left in the closing manager's discretion based on the circumstances of each night when that breakdown would begin. It was established that the mat in front of the dish area where the plaintiff fell had been picked up and placed to the side just a minute or two before her fall, but there was no evidence to support her claim that the floor in the area where she fell had been cleaned with soap and water after the mat had been removed. There was conflicting testimony as to the condition of the floor in the area where she fell as to its slipperiness and the amount of water that was present. There was also little or no evidence to support her claim that on prior dates other employees had slipped and fallen in that area under similar wet and slippery conditions.
The defendant has filed answers to the factual allegations set forth in each count of the complaint and has filed two special defenses to each count. The first special defense is dispositive of this case. That special defense states that the causes of action set forth in the Revised Complaint are barred by the exclusivity provisions of § 38-284 et CT Page 9167 seq. of the Connecticut General Statutes.
In the leading case of Suarez v. Dickmont Plastics Corporation,242 Conn. 255 (1997), Justice Katz outlined the basis upon which a claim could be made against an employer in a civil action by an employee who had been injured on the job. In that case, a Guatemalan native with a sixth grade education was working for the defendant and responsible for removing hot plastic material from machines at the end of the day. The court gave a limited discussion of the facts concerning the plaintiff's awareness of the dangers of the particular process during which two fingers on his right hand were partially amputated while he was removing this material. The case held that in order to escape the exclusivity of the Workers' Compensation Act the victim of an intentional injury must rely on the intended tort theory or the substantial certainty theory. There appears to be no claim in this case that the intended tort theory would be applicable. In that situation, the employer must have intended both the act itself and the injurious consequences of the act. Rather, it would appear that the plaintiff asks this court to allow the cause of action under the substantial certainty theory in which the employer must have intended the act and have known that the injury was substantially certain to occur from the act. Justice Katz emphasized that substantial certainty centers on whether "the employer believed the injury was substantially certain to follow the employer's acts or conducts. . . ."
In Ricalde v. Emhard Industries, Inc., 1999 Ct. Sup. 1272, 24 CLR 126
(February 4, 1999), Judge Corradino wrote a lengthy decision on a motion for summary judgment filed by the plaintiff in that case which involves the same issue presented in this matter. In Ricalde the plaintiff was operating a rubber injection molding machine used to manufacture rubber grommets. The normal production process required him to use a control panel located on the front of the machine. Because the machine was malfunctioning, Ricaldi took an adjustable wrench from a toolbox and proceeded to tighten two bolts that appeared to be causing the problem. As this was occurring, a particular device retracted and caught Ricalde's right hand resulting in the severe injury.
After a lengthy discussion concerning the training of the plaintiff and whether he had been asked to actually do repairs on the machine, Judge Corradino acknowledged the policy compromise represented by the various Workers' Compensation Acts and the danger presented by the adoption of even the restrictive version of the substantial certainty test outlined in Suarez. He pointed to the commentary of the treatise by Larson which somewhat sarcastically asked the question "unperceptively the test can become was the result in fact, not in the employer's belief, substantial certain to follow?" From this, it is an easy step to conclude: "Of course it was, as the event proved; after all, the result did follow. Ergo, it CT Page 9168 must have been substantially certain to follow." Judge Corradino points to the New Jersey courts which also adopted this substantial certainty test with the strong reservation that "if intentional wrong is interpreted too broadly this single exception would swallow up the entire `exclusivity' provision of the act, since virtually all employee accidents, injuries and sickness are a result of the employer or a coemployee intentionally acting to do whatever it is that may or may not lead to an eventual injury or disease."
Judge Corrodino then suggests that these justifiable concerns could be addressed by simply adopting a substantial certainty test which was broken down into two component parts. First, he would inquire as to-whether, from a purely physical perspective, the intentional doing of a particular act was substantially certain to cause injury, and then secondly he would ask whether the employer, in fact, believed this to be so. He suggests that proof of prior accidents involving the same type of event or machine might be some evidence as to the belief to be attributed to the employer. The same could be said of threats or orders to keep working at a particular task because it would give some indication that the employer thought such tactics were unnecessary because employees would not otherwise work at such a dangerous position.
The court spent considerable time discussing the particular Suarez
facts and applied those to the belief part of the test by suggesting that the foreman knew of the dangers and that there were, in fact, several violations of safety regulations. The court was also impressed with the fact that the foreman testified that the dangerous procedure in Suarez
would continue to be standard operating procedure because it saved the company money and increased productivity. In Ricalde Judge Corradino found that the injury occurring was fortuitous and that there was no basis to conclude that the employer believed that there was a substantial certainty of injury. He pointed to the fact that there were no prior histories of injury caused by the machinery or that there had been any violations of OSHA or other safety regulations or that any other employees had been coerced into continuing to work at the machine even if it had, in fact, broken down.
This court in the matter of Diaz v. Normao, Inc., 1999 Ct. Sup. 8719
(July 7, 1999), denied a motion for summary judgment filed by a defendant concerning a plaintiff who had suffered amputations as a result of having portions of his left and right hand caught in a particular machine. This court acknowledged the analysis of Judge Corradino and the fact that the plaintiff must demonstrate the twofold test outlined above. Since that point in time, our Appellate Court has rendered two decisions. The first involved the case of Melanson v. West Hartford, 61 Conn. App. 683
(2001), in which a plaintiff police officer filed a civil action against CT Page 9169 a defendant town and its police officials for injuries that he sustained when he was shot by a fellow police officer in the course of his duties. The trial court granted the defendants' motions to strike based upon the exclusivity of the Workers' Compensation Act and that decision was affirmed by the Appellate Court. Justice Peters, writing for the court, emphasized that under either aspect of the Suarez test the "characteristic element [of lawful misconduct] is the design to injure either actually entertained or to be implied from the conduct and circumstances. . . ." The plaintiff proposed liability based upon the substantial certainty standard for the conduct of the town. This conduct supposedly involved the failure to adequately staff, train, manage and supervise the group to which the plaintiff belonged despite warnings that the particular group might be at risk. The plaintiff claimed that the failure to take affirmative remedial action could be found as indicative of the intentional creation of a dangerous condition that made the injuries substantially certain to occur. The Court rejected that argument and indicated that the alleged town failings were allegations of misconduct that address negligence rather than intentional misconduct. The court pointed to the fact that these failures did not demonstrate anaffirmative intent to create a situation that causes personal injury. The court then noted that, even if these allegations could be stretched to encompass a claim for intentional misconduct, there was no basis for finding that the town was substantially certain that this specific injury that the plaintiff suffered would occur.
Most recently, on June 12, 2001, Judge Flynn wrote for the Appellate Court in Ramos v. The Town of Branford, 63 Conn. App. firefighter for the Town of Branford who died fighting a blaze in November of 1996. The plaintiff alleged that the fire chief recklessly failed to promulgate regulations and enforce Policies with respect to fire fighting procedures and that he knew or should have known that serious injury to fire personnel was substantially certain to result. The plaintiff also alleged that he had failed to conduct mandated inspections of particular buildings. The defendants ultimately filed a motion for summary judgment based upon the exclusivity of the Workers' Compensation Act. This was granted by the trial court and affirmed on appeal. That trial court had concluded that the defendant's allegations may be sufficient to show negligence but did not establish the facts required by the substantially certainty test. Similar to the plaintiff in this particular case, the plaintiff in Ramos relied upon the substantial certainty test and the fact that the fire chief had recklessly failed to do particular things. The court then analyzed whether the fire chief's alleged acts were undertaken with the intent to cause injury and whether the fire chief was aware that an injury was substantially certain to result from his acts. The court again looked at Suarez and understood that the factual situation must demonstrate work conditions intentionally created by the employer which CT Page 9170 made the injuries substantially certain to occur. The evidence must be sufficient "to support an inference that the employer deliberately instructed an employee to injure himself." Ramos at 679. Our Appellate Court pointed to the fact that the substantial certainty standard is a subset of the intentional tort exception. In that regard, the substantial certainty standard required a showing that the act producing the injury was intentional or deliberate and the resulting injury, from the standpoint of the employer, was substantially certain to result from the employer's acts or conduct. The Appellate Court cautioned that, whileSuarez liberalized the intentional tort standard, the plaintiff must still demonstrate that the employer's conduct was intentional. Quoting from the Larson treatise, Judge Flynn recognized that "Since legal justification for the common-law action is the nonaccidental character of the injury from the defendant employer's standpoint, the common-law liability of the employer cannot . . . be stretched to include accidental injuries caused by the gross, wanton, willful, deliberate, intentional, reckless, culpable or malicious negligence, breach of statute or other misconduct of the employer short of a conscious and deliberate intentdirected to the Purpose of inflecting injury (emphasis added)." The court found that there was no evidence in the record that the defendants' alleged violation of regulations and safety standards and the failure to inspect buildings were committed with the purpose of causing injury all with knowledge that the injury to a firefighter was substantially certain to result. The court firefighter was substantially certain to result. The court concluded that the failure to take affirmative remedial action, even if wrongful, did not demonstrate "an affirmative intent to create a situation that causes personal injury." Ramos at 685. The court again quoted from Melanson in stating that "a wrongful failure to act to prevent injury is not the equivalent of an intention to cause injury."Ramos at 685. The motion for summary judgment was affirmed.
In this particular case involving Patricia Safford, the plaintiff presented the testimony of several witnesses concerning the events of the particular evening. In the testimony of Kurt Geissinger, the current manager of the restaurant, we learned of the intentions of the corporation to promote the safety of the workers and the use of videos with respect to the very topic of slip and fall accidents. We also learned that mats had been placed in the kitchen for the very purpose of promoting the safety of the servers as they walked in and out of the particular area. We also learned that garbage bins were placed in the area of the dishwasher and that the servers would be required to scrape the dishes into the bins prior to placing the dishes on the bench for cleaning. At times, pieces of food would fall onto the floor which required the area to be cleaned.
Through the testimony of the plaintiff, we learned she had been in the CT Page 9171 kitchen only two or three minutes prior to her fall and that all of the mats were on the floor. She then returned a short time thereafter and, as she entered the kitchen carrying dessert plates, she slipped. Several of the plaintiff's own witnesses contradicted her statement and suggested that she actually had a full tray of dishes when she came into the kitchen and fell. The plaintiff testified she had sustained no other falls in the kitchen.
The sum total of all of this evidence is that the plaintiff's case cannot, in any way, approach the substantial certainty test of Suarez as analyzed on several occasions subsequent to that decision. As noted in the recent Ramos case, the allegations may be sufficient at some point to show negligence but do not in any way support an inference that the employer deliberately instructed the employee to injure herself or that the work conditions were intentionally created by the employer which made the injuries substantially certain to occur. In this case, the plaintiff's Revised Complaint seems premised upon a claim that both removal of the mat and the application of soap and water to the floor created this condition that would satisfy the substantial certainty test. In point of fact, there is no evidence with respect to the soap and water having been applied as part of the breakdown process. The best that the plaintiff can offer to the court is that someone in the kitchen presumably picked up the particular mat for purposes of either cleaning the mat or cleaning the floor. There producing the injury be intentional or deliberate and that the employer, presumably in the person of Kevin Lapinski, believed that the plaintiff's injury was substantially certain to follow from his conduct. None of the historical observations concerning patterns of behavior, significant prior incidents, or a violation of OSHA or safety regulations were presented to this court for consideration as to what might be inferred as to the employer's knowledge. Tthe contrary, the evidence presented suggested the intention of the defendant to promote the safety of the workers. As the court inMelanson warned, the failure to take affirmative remedial action to correct the situation does not demonstrate an affirmative intent to create a situation that causes personal injury. This case must be rejected based upon the Special Defense because of the very concern expressed by the court in Ricalde that these types of cases would swallow up the exclusivity provisions of the Workers' Compensation Act.
Judgment will enter in favor of the defendants based on the plaintiff's failure of proof in establishing the exception based on substantial certainty to the exclusivity provisions of the Workers' Compensation Act and the Special Defense of that doctrine to the complaint.
GORMLEY, J. CT Page 9172